532 F.2d 10
 36 A.L.R.Fed. 638
 Steven GOLDMAN, on his own behalf and on behalf of a class
consisting of all other First BankAmericard
cardholders similarly situated,
Plaintiff-Appellant,
v.
The FIRST NATIONAL BANK OF CHICAGO, Defendant-Appellee.
 No. 75-1339.
 United States Court of Appeals,
Seventh Circuit.
 Argued Sept. 24, 1975.
Decided March 2, 1976.
Rehearing In Banc Denied April 28, 1976.
 
 Aram A. Hartunian, Chicago, Ill., for plaintiff-appellant.
 Joseph DuCoeur, Chicago, Ill., for defendant-appellee.
 Before STEVENS, Circuit Justice,* SWYGERT, Circuit Judge, and KUNZIG, Judge.**
 SWYGERT, Circuit Judge.
 
 
 1
 This appeal presents two questions: whether the trial court's refusal to allow this action under the Truth in Lending Act[1] to proceed as a class action was an abuse of discretion, and whether in plaintiff-appellant Steven Goldman's individual suit before a different judge, the court erred in holding that the statutory limitations period contained in the Act barred Goldman's action.[2]
 
 
 2
 The limitations question was decided by way of summary judgment for the defendant and against the plaintiff on Counts I, II and III of the amended complaint, each charging violations of the Act, and a dismissal of Counts IV, V and VI, each based on Illinois law and brought pursuant to pendent jurisdiction. The plaintiff Goldman applied to the First National Bank of Chicago for a BankAmericard credit card on April 3, 1970. The application was on a printed form prepared by the Bank. A part of the form was entitled, "Disclosure Statement As Required by the Federal Truth-in-Lending Act."[3] The application also included the Bank's contract with its cardholders. Among the provisions were the following:
 
 
 3
 3. Customers will be furnished monthly statements for all purchases and borrowings made with Customer's BankAmericard(s). Customers will pay such statements by remitting to the issuer or the Bank through which his BankAmericard is issued within 25 days after billing date.4. In respect to credit purchases, the aggregate of all finance charges shall not exceed 11/2% per month of the outstanding principal balance per month of the outstanding principal balance owing during the billing period. Finance charges shall commence 25 days from billing date.
 
 
 4
 The plaintiff's application was approved by the Bank in April of 1970 and his credit card was sent to him shortly thereafter. The plaintiff used his card initially on July 1, 1970 and continued to make purchases during the remainder of the year. Each billing statement included the following information:
 
 PAYMENT INFORMATION
 
 5
 4. . . . "FINANCE CHARGE" at the rate of 11/2% per month for "MERCHANDISE PURCHASES" is charged to your account on your next billing date (see stub on reverse side) unless the "NEW BALANCE" on this statement is paid in full within 25 days after your billing date.
 
 
 6
 The plaintiff paid the balance in full on each billing statement he received from September 1970 through January 1971 within the specified twenty-five day period and thereby did not incur any finance charges; as to the plaintiff's check for his February 8, 1971 billing statement, however, it shows that it was not received until March 9, 1971. Because the payment had not been made within the twenty-five day "free ride" period, a finance charge of $1.19 was imposed by the Bank on its March 8 billing statement. The plaintiff alleges that this sum represented a finance charge for the period from February 9 to March 8, 1971 at the rate of 1.5 percent per month. Referring to that part of the credit card agreement form which states "finance charges shall commence 25 days from billing date," Goldman states the appropriate finance charge would have been thirteen cents, representing charges for the three days between the end of the twenty-five day period and the March 8 billing date.
 
 
 7
 The plaintiff brought his suit under the Truth in Lending Act on behalf of himself and a class of BankAmericard credit cardholders similarly situated.
 
 
 8
 * We first address the question of the denial of class determination. The district court concluded that Goldman did not meet the requirements of any of the subsections of Rule 23(b) of the Federal Rules of Civil Procedure. That rule requires that the court determine first if the standards for maintenance of a class action are met under Rule 23(a),[4] and, if they are, then the plaintiff, in addition, must demonstrate that:
 
 
 9
 (1) the prosecution of separate actions by or against individual members of the class would create a risk of
 
 
 10
 (A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or
 
 
 11
 (B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or
 
 
 12
 (2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the finding's include:
 
 
 13
 (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions;
 
 
 14
 (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class;
 
 
 15
 (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum;
 
 
 16
 (D) the difficulties likely to be encountered in the management of a class action.
 
 
 17
 The district judge concluded that the action before him did not fall within any of the categories of Rule 23(b) and disallowed the motion for a determination of a class.
 
 
 18
 Goldman argues that his action properly falls within subsection 3 of Rule 23(b) and that it was an abuse of discretion for the district court not to allow the suit to proceed as a class action. To support his position the plaintiff relies on Haynes v. Logan Furniture Mart, 503 F.2d 1161 (7th Cir. 1974), and the recent amendments to the Truth in Lending Act, Pub.L. 93-495, 15 U.S.C. § 1640(a) (Feb. 1975 Supp.).
 
 
 19
 The district judge prefaced his consideration of the applicability of both subsections 2 and 3 of Rule 23(b) with a discussion of the provision of the Act which, prior to amendment provided for a minimum statutory amount of recovery of $100 without differentiation between individual and class actions. Goldman had attempted in his amended complaint to disclaim the minimum statutory amount on behalf of himself and all other members of the class. The district judge concluded that a representative plaintiff had no authority to make this disclaimer on behalf of members of his class.[5] The judge went on to consider the superiority of a class action under Rule 23(b)(3). Relying on Judge Frankel's language in Ratner v. Chemical Bank of New York Trust Co., 54 F.R.D. 412 (S.D.N.Y.1972), the judge determined that a class action in this case would not be superior to other available methods for the fair and efficient adjudication of the controversy. Since it is apparent from the judge's comments that the prospect of a crushing damage award affected his decision in regard to the question of superiority of class procedure, it is important to note initially that the amendment to the Act has obviated the problem of disclaimer in suits of this nature. Public Law 93-495, Title IV (October 28, 1974) § 408 amended the original Act to provide that a creditor failing to comply with the Act was liable:
 
 
 20
 (a)(2)(B) in the case of a class action, (for) such amount as the court may allow, except that as to each member of the class no minimum recovery shall be applicable, and the total recovery in such action shall not be more than the lesser of $100,000 or 1 per centum of the net worth of the creditor.
 
 
 21
 The statute further provides that in determining the amount of award in any class action, "the court shall consider, among other relevant factors, the amount of any actual damages awarded, the frequency and persistence of failures of compliance by the creditor, the resources of the creditor, the number of persons adversely affected, and the extent to which the creditor's failure of compliance was intentional."
 
 
 22
 Prior to the amendment this court had determined that class actions were not barred in Truth in Lending cases. Haynes v. Logan Furniture Mart,503 F.2d 1161 (7th Cir. 1974). Noting that trial courts are usually afforded great latitude in determining the fairest and most efficient methods of adjudication under Rule 23(b)(3), we concluded that the denial of a class determination was an abuse of discretion, predicated as it was on the legal theory that the procedural device of such actions was incompatible with the substantive ends to which the Act is addressed. 503 F.2d at 1163.
 
 
 23
 We believe the same predilection was evident in the instant case. The district court's consideration of the criteria of superiority in subsection 23(b)(3) in the case now before us "embrace(d) wholeheartedly" the language of Ratner. In that case the trial court had accepted the defendant's argument that the incentive benefits inherent in class actions were unnecessary in view of the statutory minimum provided in the Act, and that a recovery of such minimums by an entire class would present a "horrendous, possibly annihilating punishment, unrelated to any damage to the purported class." Goldman v. First National Bank, 56 F.R.D. 587, 593 (N.D.Ill.1972). The district court in the instant case also quoted Ratner's conclusion that the allowance of class actions in cases such as this was "essentially inconsistent with the specific remedy supplied by Congress."
 
 
 24
 Since the district court's determination of the question of the appropriateness of the class depended, at least in part, on its acceptance of the idea that class actions are incompatible with Truth in Lending cases, we must under the rationale of Haynes proceed to consider whether a class action is in fact a superior method of adjudicating the present controversy.[6]
 
 
 25
 We find the decision in Haynes does provide guidance. We suggested that although, in Truth in Lending cases, procedural fairness with respect to
 
 
 26
 protecting defendants from crushing damages predicated on the statutory minimum recovery is an important consideration in determining the superiority of the class action mode of adjudication, it is at least equally important to prevent violators of the Act from limiting recovery to a few individuals where actual, wide-spread noncompliance is found to exist.
 
 
 27
 On balance, class actions might very well be superior to individual suits, because while the former would compel correction of disclosure errors and full collection of damages, the latter would result only in correction of errors, for collection damages would be sharply restricted by the short statute of limitations (16 U.S.C. § 1640(e)), the inability of the poor or uniformed to enforce their rights, and the improbability that large numbers of class members would possess the initiative to litigate individually. 503 F.2d at 1164-65.
 
 
 28
 The opinion delineated some of the factors we thought important in evaluating the appropriateness and desirability of class action status. We deemed it "highly significant" that there were actual damages alleged, that in fact a finance charge was imposed and an interest rate applied. In Ratner, by contrast, the periodic statement under scrutiny reported "an outstanding principal balance but no interest charge (had) yet accrued." Ratner, 54 F.R.D. at 413. In Haynes we then noted that under the statute the individual recovery of twice the finance charge in the transactions for most of the class members would exceed the statutory minimum recovery provided in 15 U.S.C. § 1640. As our prior discussion indicated that we noted this point as a part of our assessment of the unfairness which would result to the defendant by allowing a class action when there was no waiver of the statutory minimums for the members of the class. If their individual recoveries in most cases would have exceeded the minimum amount, it was not unfair to the defendant to allow the suit to proceed as a class action. We then considered the number of prospective class members and found this small (2500) in comparison with Ratner (130,000). Our final consideration was that the notice requirements of Rule 23(b)(3) would pose few problems since the consumers were identifiable from the company's installment contract records. Haynes, 503 F.2d at 1165.
 
 
 29
 The introduction of the amendment to the Act in 1974 specifically providing for the waiver of the statutory minimum in class actions has an important bearing on the consideration of the factors enumerated in Haynes. Our attention to the amount of finance charges which were imposed in each transaction and our reference to the total number of possible class members are considerations which relate directly to a projection of the amount of recovery and the hardship it would impose on the defendant. With the statutory minimum provision eliminated in class actions and a maximum recovery established under the amendment, these factors, especially as they relate to the number of class members, should be accorded less weight in deciding whether the suit should proceed as a class action. Goldman has in his third amended complaint set forth two alternative measures of damages. He first suggests that the court award to the members of the class twice the amount of finance charges imposed on them. The alternative measure would require the Bank to pay to the class members the amount of undisclosed interest that was charged to them. Fairness to the members of the class is, of course ensured under the notice requirements of Rule 23(b)(3) which would allow those who wish to pursue their individual remedy to opt out of the class.[7]
 
 
 30
 After considering the significant facts in Haynes, we conclude that a class action was appropriate under the circumstances of the instant case and that it was an abuse of discretion on the part of the district judge not to allow it to proceed as such. The amendment of the Act which permits the waiver of the statutory minimum and establishes maximum amount of recovery for the class alleviates the hardship which might result if defendants were subjected to class actions involving large numbers of credit cardholders. The members of the class may be identified through the Bank's records. In cases of this nature, where a plaintiff has satisfied the requirements of Rule 23(a) and common questions of law and fact predominate, the final question is whether a class action is superior to other methods of adjudication. We rule that it is in the suit presently before us.
 
 II
 
 31
 The second district court opinion found that Goldman was unable to maintain an individual action because his claim was barred by the limitations provision of the Act, 15 U.S.C. § 1640(e). Goldman filed his complaint more than one year after he had applied for credit from the Bank. The Bank's contention, with which the district judge agreed,[8] is that the statutory language which provides for actions brought "within one year from the date of the occurrence of the violation" bars this suit. The trial judge concluded that:
 
 
 32
 the purpose of the statute is to provide full disclosure to the consumer of the cost of using credit to the end that he may more intelligently use it. Disclosure is what Congress intended. Violation of the disclosure provision must occur, if at all, sometime before the first transaction occurs. In this case, disclosure occurred when defendant received and accepted the card . . . or, at the very latest, . . . when plaintiff first used the card. Thus, the statute of limitations bars this action since the complaint was filed . . . more than one year after the disclosure was made.[9]
 
 
 33
 The application for the card was made on April 3, 1970, it was issued about a month later, and the first transaction by Goldman using the card occurred on July 1, 1970. The Bank argues that one of these dates is the appropriate one to use for measuring the statutory year. Since the complaint was not filed until July 8, 1971, the use of any of these dates would bar the claim.
 
 
 34
 Goldman argues that the court should consider the nature of the credit plan under review when applying the statutory limitations period. His argument casts the question before us in novel terms. He emphasizes that his case concerns an "open end credit plan" whereas all but one of the reported cases under the Act to date have dealt with "close end credit transactions."[10] Goldman offers four theories in support of his conclusion that open end credit plans should be treated differently in regard to the limitations question.[11] The theories fall into two categories. The logic of the first category is that a false or misleading disclosure is the equivalent of no disclosure, but that such misstatement is impossible to discover until a finance charge has been levied; there is, in other words, no action taken by the lender inconsistent with the false or misleading statement until such a charge is imposed and thus the relevant date for the limitations period should be the date on which the charge was first assessed. That is the date on which a debtor may be expected to first discover that a violation has occurred. If no disclosure was made, of course, the debtor would be cognizant of that fact on the day the credit disclosure forms were given to him, but, Goldman argues that when there has been inaccurate, partial or misleading disclosure, there is no way, prior to the billing of an inconsistent finance charge, for the violation to be ascertained and action taken. Goldman concludes that using the date of the imposition of the first finance charge as the triggering date in open end credit transactions where there has been a disclosure which appears on its face to comply with the Act would be consistent with the purposes of the Act.[12]
 
 
 35
 Goldman's second category is that of "continuing violations." Under this approach, he argues that the limitations period did not begin to run until the Bank had fulfilled its statutory duty to disclose according to the standards imposed by the Truth in Lending Act. Adoption of this theory by the court would also allow Goldman's action to proceed.
 
 
 36
 Before beginning our analysis, we note that the violation defined in the Act is that of not disclosing the method the creditor will use when computing finance charges. The intent of Congress in enacting the legislation is set forth in 15 U.S.C. § 1601 which states:
 
 
 37
 The Congress finds that economic stabilization would be enhanced and the competition among the various financial institutions and other firms engaged in the extension of consumer credit would be strengthened by the informed use of credit. The informed use of credit results from an awareness of the cost thereof by consumers. It is the purpose of this subchapter to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit.
 
 
 38
 The Act does not condemn in specific terms the situation where there has been a false or misleading disclosure. This type of behavior is, however, encompassed within the legislation, the intent of which is to "assure a meaningful disclosure of credit terms."
 
 
 39
 In practical terms, under an open end credit plan, there is no extension of credit simply by the issuance of the card.[13] An agreement has been reached between a potential borrower and a lender who defines the conditions and terms under which its credit service may be used. Until the consumer negotiates a transaction using the credit card there has been no extension of credit no debt has accrued and the creditor's funds have not been transferred to the use of the borrower.
 
 
 40
 This type of credit plan differs from the close end plans not only because no credit has been extended at the time of the agreement, but also because no set amount of debt has been incurred. Open end credit plans may impose ceilings or debt limits on their customers' line of credit, but as payments are made, the lines are cleared and the gross total of the transactions may well exceed the ceiling amount so long as payments keep the net balance at any one time below the credit limit.
 
 
 41
 It is apparent from the legislative history that Congress had some difficulty dealing with the problems that the open end type of credit arrangement represented in terms of the Act's purpose of ensuring disclosure so as to allow consumers to make intelligent credit decisions. Open end credit plans were singled out for "special treatment" in the House Report accompanying the bill. The bill had been amended so that this type of credit plan was exempted from the requirement of disclosure of annual percentage rates for finance charges. The House Committee believed that the use of periodic rates (most commonly, the percentage imposed on a monthly basis) was appropriate in spite of significant opposition to that method of accounting.[14] The opposition urged the use of an approximate annual rate even though "the yield to the creditor may be more or less than the nominal annual rate (because) disclosure . . . is necessary to assist the consumer in 'comparison shopping' for credit under a (open end) account, as opposed to other forms of credit transactions."[15] To mitigate against this competitive advantage and to provide additional protection for open end consumers, the Committee bill provided that if a customer requested, he would receive an approximate annual percentage rate figure for his account. The Act also required that open end credit plans under 15 U.S.C. § 1637(b) include in their periodic billing statements certain information relating to the credit transactions which had taken place.
 
 
 42
 An examination of the distinctive qualities of open end credit plans and the problems they present is necessary for an understanding of Goldman's assertion that the statutory limitations period should not run against him until there has been a finance charge imposed which would put him on notice that a violation had occurred. Goldman's observation that when the disclosure statement is false, incomplete or inaccurate, it is not until the imposition of the first finance charge that the debtor can perceive that a violation has occurred is irrefutable. In close end transactions the finance charge is divided into the term of the loan and incorporated into the time payments and thus the rate is computable by the consumer from the time he receives his first billing. With an open end plan, however, especially those like the one at issue which includes a "free ride" period, it is necessary that there first be a transaction for which a finance charge is imposed in order for the consumer to evaluate the accuracy of the disclosure. It may, therefore, be months before a violation is perceived.[16]
 
 
 43
 The cases under the Act which have considered the statutory limitations period have done so in the context of close end credit plans. Wachtel v. West, 476 F.2d 1062 (6th Cir. 1973), a decision heavily relied upon by the Bank here, addressed the narrow question presented on appeal whether the violations of the duty to disclose information occurred at the time it was first required to be made, or whether there were a series of continuing violations until such time as disclosure was actually made. The Sixth Circuit examined the purposes of the Act and the regulations that had been promulgated pursuant to its authority. The court concluded that in order to allow the consumer to make a "meaningful" credit decision, as was the legislation's purpose, it was necessary that he have the required information in his possession before he became committed to any particular lender. The court found this conclusion supported by section 1639(b) of the Act which directs that the disclosures required in section 1639(a) (loan transactions) be made "before credit is extended."[17] The Act provides no definition of when credit is deemed extended and the court looked to Regulation Z which defined the time at which a transaction be considered "consummated." This period is set as the time at which a contractual relationship is created between a creditor and a customer, irrespective of the time of performance of either party. The court in Wachtel then concluded that a credit transaction which required disclosure under the Act was completed when the lender and borrower contracted for the extension of credit and that in order for there to be no violation the disclosures must be made before that time. If, however, the disclosures were not made, the court concluded that the violation occurred at the very latest at the time at which the parties performed their contract.
 
 
 44
 Subsequent cases have not uniformly followed the reasoning of Wachtel when confronted with the theory of continuing violations under the Act, but they have generally agreed that there is a certain specific time at which a violation of the disclosure requirement occurred and from which the limitations period will then run. Stevens v. Rock Springs National Bank, 497 F.2d 307 (10th Cir. 1974); Kristiansen v. Mullins and Sons, Inc., 59 F.R.D. 99 (E.D.N.Y.1973). Cf. Postow v. Oriental Building Association, 390 F.Supp. 1130 (D.C.1975).
 
 
 45
 There are several distinctions between the transactions involved in the Wachtel line of cases and those in the instant case. Wachtel was concerned with disclosures required in close end transactions under section 1639(a) of the Act. Here we are examining an open end plan which is governed by section 1637 which does not contain a provision analogous to section 1639 which sets forth the "Form and Timing of Disclosure" applicable to the requirements defined in another subsection. Section 1637, by contrast, prefaces its list of required disclosures with the admonition that: "(b)efore opening any account under an open end consumer credit plan, the creditor shall disclose to the person to whom credit is to be extended each of the following items" (emphasis added). Under the process employed by the Wachtel court then, when considering a section 1637 transaction, it would not be necessary to refer to Regulation Z for a definition of the statutorily designated time at which the duty to disclose arose. The statute is clear that the duty is imposed under section 1637 before the opening of the account. If Regulation Z is consulted, however, section 226.7 designates as the relevant disclosure time that period: "(b) efore the first transaction is made on any open end credit account" (emphasis added). If, then, there is a violation of the Act in an open end credit plan, it occurs at the time the account is opened, or at the very latest, some time before the first transaction takes place. Goldman's argument that there has not been a completed "transaction" through which a violation could occur until a finance charge is imposed, therefore, is incorrect. We also reject his argument that the situation here presented is one in which there are continuous violations that the duty to disclose mandates that until disclosure is made as required by the Act, a violation continues and thus the statute is tolled. This argument we believe is also precluded by the language of the statute.
 
 
 46
 Our conclusions arrived at thus far do not, however, resolve the issue. An additional distinction between Wachtel and the case here is more significant. The earlier cases were ones in which there had been no disclosure and, thus, the violation was immediately apparent. Goldman's argument that false, misleading or inaccurate disclosures be treated differently than the situation where no disclosure has been made for the purpose of measuring the limitations period is relevant to an evaluation of when a cause of action accrued for purposes of computing the limitations period. Goldman asserts that the doctrine of fraudulent concealment operates in this case to suspend the application of the limitations period. This argument has two dimensions: that the concealment was "active" in that the Bank intentionally concealed the method of determining the balance upon which it would compute the finance charge in view of the "free ride" period; or, that even if there was no attempt on the part of the Bank to actively conceal the misrepresentation, the statute of limitations should not begin to run until the consumer had an opportunity to perceive that a violation had occurred. The focus of the latter argument is on the lack of opportunity on the part of a consumer to discover that a wrong had occurred. In addition, Goldman argues that the purpose of the Act is furthered by excepting his approach to the limitations period and that the district court's harsh construction of that provision frustrates the intent of Congress to protect consumers from "the uninformed use of credit."
 
 
 47
 It is not necessary to consider Goldman's contentions on the fraudulent concealment theories. We are persuaded that when, as here, there has been an incomplete, inaccurate or misleading disclosure, the limitations period should not be measured from the date the disclosure was required by law to be made, but instead by the date on which a finance charge was first imposed. In addition to the stated legislative intent in the Act and the unique but somewhat problematic nature of open end credit arrangements (already discussed in this opinion), there are other considerations which compel the result we reach.
 
 
 48
 One consideration is the importance of the imposition of a finance charge to the legislative scheme. Prior to amendment, 15 U.S.C. § 1640(e) provided that the creditor's liability would be twice the amount of finance charge imposed in connection with the transaction. The 1974 amendment did not change this measure for individual actions, but added the provision for measurement of damages in class actions. The finance charge is the measure of damages imposed by the statute the central consideration. Actions have been allowed and liability found when there has been no finance charge imposed,[18] but the imposition of a finance charge was clearly contemplated as the event which would usually give rise to a suit under the Act. The fact that it is not the only event which may precipitate an action is immaterial. The imposition of a finance charge under an open end credit plan in which an inaccurate disclosure has been made is a necessary condition for the assessment of liability since it is this charge against which the accuracy of the disclosure must be measured. The Act focuses on the finance charge, designating it in most cases as the measurement for damages. The "informed use of credit" which the Act seeks to ensure is not possible if the cost of financing is hidden. In close end plans a determination of the charges is possible from the time of the first payment. In open end plans with "free ride" periods, a finance charge may not appear until after many payments have been made. Until a finance charge is levied the debtor has no cause for complaint since there has been no action inconsistent with the inaccurate disclosure.
 
 
 49
 We also find it significant that the Act mandates the disclosure of the information here in question only at the time of the opening of the account. Goldman's complaint is that the statement was inaccurate in describing the date on which finance charges commenced. This information required by subsection (a) of 15 U.S.C. § 1637, which provides that before the account is opened the creditor disclose "the method of determining the amount of the finance charge," does not have a counterpart in subsection (b) which delineates the disclosures which must be made with each billing cycle. A consumer may not then resort to an action based on the disclosure required in the billing statement as the ground for his action once the limitations period has run for a claim under subsection (a). If he is to be given any relief, it must result from the creditor's violation of subsection (a).
 
 
 50
 We think our decision here is consistent with those cases which designate as the time from which a statute of limitations begin to run the date at which the last significant event necessary to make the claim suable occurs. United States v. Wurts, 303 U.S. 414, 58 S.Ct. 637, 82 L.Ed. 932 (1938); Mack Trucks, Inc. v. Bendix-Westinghouse Automotive Air Brake Co., 372 F.2d 18 (3d Cir.), cert. denied, 387 U.S. 930, 87 S.Ct. 2053, 18 L.Ed.2d 992 (1967). In view of the fact that a disclosure had been made, that the open end plan in question contained a free ride provision which if the consumer was prompt with his payments allowed a significant amount of time to pass before any finance charge was imposed, and the fact that Congress clearly sought to compel accurate disclosure, the purposes of the Act are best served by allowing this action to proceed, unbarred by the limitations period. We note that this holding by its own terms is limited to the unique and narrow set of circumstances presented in open end credit plans.
 
 
 51
 The judgment of dismissal is reversed and the case is remanded for a determination of class members and a trial on the substantive issues.
 
 
 52
 STEVENS, Circuit Judge (dissenting).
 
 
 53
 For the reasons ably set forth by Judge Swygert, it might have been wise for Congress to enact a different limitation provision for open end transactions than for closed end transactions. As I read Section 1640(e), however, it imposes the same requirement in cases involving either type of transaction plaintiff must bring his action under the statute within one year from the date of the occurrence of the violation. Since this plaintiff failed to do so, I am persuaded that he may not avail himself of the remedy created by this statute.
 
 
 
 *
 Mr. Justice John Paul Stevens participated initially as Circuit Judge and on and after December 19, 1975 as Circuit Justice
 
 
 **
 The Honorable Robert L. Kunzig, Judge of the United States Court of Claims, is sitting by designation
 
 
 [1]
 15 U.S.C. § 1601 et seq. (1970), as amended, Pub.L.No. 93-495 (October 28, 1974)
 
 
 [2]
 15 U.S.C. § 1640(e) which sets forth the time limitation for filing suits reads:
 Any action under this section may be brought in any United States district court, or in any other court of competent jurisdiction, within one year from the date of the occurrence of the violation.
 There have been two lower court opinions in this case. The class action determination was denied in Goldman v. First National Bank, 56 F.R.D. 587 (N.D.Ill.1972). The statute of limitations decision is reported at 392 F.Supp. 214 (N.D.Ill.1975).
 
 
 [3]
 The Bank's "disclosure" reads in part:
 Q. When must I pay a FINANCE CHARGE?
 A. The FINANCE CHARGE for Merchandise Purchases is charged to your account on the billing date next following the initial billing of the purchases on the portion of the purchases not reduced by your payments. However, if the entire billed balance for any given month is paid in full, no FINANCE CHARGE for Merchandise Purchases will be imposed. The FINANCE CHARGE for Cash Advances begins on the date the cash advance is made by BankAmericard and continues up to and including the date when payment is received by BankAmericard.
 Q. How do you determine the balance upon which a FINANCE CHARGE is imposed . . .?
 A. The balance on which the FINANCE CHARGE is imposed for Cash Advances and for Merchandise Purchases represents the average daily Cash Advance principal and the average daily unpaid Merchandise Purchase principal owing on your account during the billing period. If payments received and credits made during the billing period reduce the previously billed balance to zero, then the FINANCE CHARGE Balance for merchandise purchases will be zero.
 
 
 [4]
 Rule 23(a) provides that a class action can be maintained only if:
 (1) the class is so numerous that joinder of all members is impracticable,
 (2) there are questions of law or fact common to the class,
 (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and
 (4) the representative parties will fairly and adequately protect the interests of the class.
 The district court found that subsections 1, 2 and 3 were satisfied but failed to reach a conclusion on subsection 4 due to the nature of disposition of Goldman's motion for a determination of class.
 
 
 [5]
 The court found that if plaintiff as an individual waived the statutory minimum he could affect only his individual rights, but would then not have interests in common with the members of the class and could therefore not act as their representative. Goldman v. First National Bank, 56 F.R.D. 587, 592 n. 4 (E.D.Ill.1972)
 
 
 [6]
 The requirements of section (a) of Rule 23 are satisfied as determined by the district court, supra, n. 4. The determination of subsection 4 of Rule 23(a) was not made explicitly in the court's opinion, but we note that Goldman's withdrawal as counsel in the case removed the judge's major objection to his acting as the representative party for the class
 
 
 [7]
 Goldman's theories of recovery are linked to specific allegations in his complaint (i. e., restitution of the amount of undisclosed interest under an unjust enrichment theory; twice the amount of finance charges under the Act's prohibition against nondisclosure)
 
 
 [8]
 Since the district court granted the Bank's motion for summary judgment, and it did not reach the question of whether the forms the Bank used at the time Goldman applied for his credit card in fact violated the standards applicable under the Act, our decision will not reach the merits of the claim, but will only address the statute of limitations question. Both parties have argued the merits, but the trial court is initially the appropriate forum for that resolution
 
 
 [9]
 Goldman v. First National Bank, 392 F.Supp. 214 (N.D.Ill.1975)
 
 
 [10]
 The one reported case which involved an open end credit plan is White v. Central Charge Service, Inc., CCH Consumer Credit Guide, P 9.170, at 89,063 (1969-73 Transfer Binder). In that case the plaintiff alleged a violation of section 1637(b)(2) of the Act which requires a description of the goods purchased to be included on the periodic billing statement sent to the customer. The White court found that since prior to the receipt of the billing statement the consumer could not be aware of its content and thus that a violation of the Act had occurred, the statute ran from the date the statement was received. The White case is of no assistance in analyzing the instant action. The requirements in regard to periodic billing statements represent independent violations of the Act. The violation alleged in White was in such a billing statement and not in the disclosure statement. White, therefore, is analogous to an omission in a disclosure statement, not to a situation where there has been a false, incomplete or misleading disclosure as Goldman alleges in the instant case
 
 
 [11]
 An open end credit plan is one in which credit terms are initially established with the opening of the account, but no fixed amount of debt is incurred at that time. Purchases made from time to time are added to the outstanding balance in the account and each new purchase represents an additional extension of credit under the terms as originally defined in the credit agreement. As the Act defines it in section 1602(i):
 The term "open end credit plan" refers to a plan prescribing the terms of credit transactions which may be made thereunder from time to time and under the terms of which a finance charge may be computed on the outstanding unpaid balance from time to time thereunder.
 
 
 [12]
 Goldman asserts that the Bank fraudulently concealed the real nature of its interest charges, or that no cause of action occurred until a finance charge was imposed, or that there was no notice to the borrower that a violation had occurred until a charge was actually imposed. Under the first theory, the time period would not run until the borrower knew or should have known of the violation. Under the latter two theories, the time would be measured from the time the finance charge was first imposed. All three theories would allow the action to continue
 
 
 [13]
 The definition of the term "open end credit" set forth, supra, at n. 9, supports this conclusion as does section 1637(b) which mandates the required disclosures for periodic billing statements in open end accounts. That section provides that the periodic statement include:
 (2) The amount and date of each extension of credit during the period.
 The individual transactions completed through the use of the card should then be considered as discreet extensions of credit.
 
 
 [14]
 Representative Patman and ten other Congressmen, issued a Supplemental View which set forth their displeasure with the committee's amendment to the proposed bill which permitted certain open end creditors to express their charges to consumers in periodic percentage rate basis rather than on an annual basis. The amendment was attributed to the reasoning "vigorously" offered by spokesmen for the largest retailers in the country that a charge of one and one-half percent a month assessed on a customer's unpaid balance does not in fact represent a rate of eighteen percent a year because typically the customer pays off the balance long before the year elapses by making payments on his account, and often he is liable for no service charge whatsoever because the use of a "free ride" period in most accounts of this type means that, if the balance in the account is paid in full before a certain date, there is no charge to the customer for financing. U.S.Code and Administrative News, 90th Cong., 2d Sess., 1968, p. 1992. The retailers had argued that if an annual rate were to be required for the open end form of credit, it should be determined retroactively, at the end of a year, and "based on the number of days the customer enjoyed free credit as well as the total credit charges be paid." U.S.Code Cong. & Admin.News 1968, pp. 1962, 1992
 
 
 [15]
 House Report No. 1040, U.S.Code and Administrative News, 90th Cong., 2d Sess., 1968, p. 1971
 
 
 [16]
 That was the situation in this case. Goldman made a number of purchases with the card prior to the one which precipitated this suit, but since he paid the balance of the account during the "free ride" period, no finance charge was levied. There was not, therefore, any action by the Bank inconsistent with the disclosure statement prior to the imposition of the first finance charge
 
 
 [17]
 Section 1638 which sets forth the required disclosures for sales not under open end credit plans has an analogous provision
 
 
 [18]
 Mourning v. Family Publications Service, Inc., 411 U.S. 356, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973), where the Court found a rule valid in spite of the fact that the Act mentioned disclosure only in those cases in which a finance charge was imposed while the rule promulgated by the Federal Reserve Board encompassed situations in which no such charge was levied. The Court reasoned that Congress did not attempt to specify all situations in which the Act would apply and that the deterrent effect of the rule which reached transactions in which finance charges were concealed in the selling price clearly implemented the objectives of the Act