**Jerome I. BASKIN, Plaintiff,**

**v.**

**G. FOX & CO., et al., Defendants.**

**Civ. A. No. H–77–354.**

United States District Court,
D. Connecticut.

Oct. 8, 1982.

---

Richard K. Lublin, Richard I. Sellman, Samuel Feldman, East Hartford, Conn., for plaintiff.

Ronald J. Cohen, Robert K. Ciulla, Robert W. Allen, New Haven, Conn., for defendants.

## MEMORANDUM OF DECISION

ZAMPANO, District Judge.

In this action, tried to the Court, the plaintiff seeks statutory damages and attorney's fees based on the defendants' purported violations of the Consumer Credit Protection Act, commonly referred to as the Truth-in-Lending Act ("the Act"), 15 U.S.C. § 1601 *et seq.*, and its Connecticut counterpart, Conn.Gen.Stat. § 36–393 *et seq.* In essence, the plaintiff claims that the defendants, G. Fox & Co. and The May Department Stores Company, did not correctly disclose to consumers the method by which finance charges were computed under their "open-end" credit plan.

The defendants contend: 1) the plaintiff does not qualify as a "consumer" under the Act; 2) the statutory limitations period contained in the Act bars the plaintiff's action; and 3) the finance charge disclosures complied precisely with the requirements of the Act. As a separate defense, The May Company submits that there is no evidentiary basis to hold it liable for the acts of defendant G. Fox.

### FACTS

In October 1973, the plaintiff, a certified public accountant and former employee of G. Fox, opened a credit card account with G. Fox under the name "Jerome I. Baskin, C.P.A." and listed his business address for billing purposes. The open-end credit plan permitted plaintiff to defer payment of debts incurred in purchases at the defendant's department store in Hartford.

From October 1973 to November 1975, the plaintiff utilized his credit card for numerous purchases, including such items as furniture, appliances and gifts. Monthly bills included the following information:

Any FINANCE CHARGE shown on the front side was determined by applying a monthly periodic rate of 1% (12% ANNUAL PERCENTAGE RATE) to the average daily balance shown on the front side. The average daily balance is determined by adding the outstanding balances (including current payments, other credits and purchases) in the account for each day of the billing period and dividing this total by the number of days in each billing period.

Finance charges were first assessed on the monthly bill sent to plaintiff on December 6, 1973, and continued to be added thereafter on almost every monthly bill through August 1976. The last purchase made at G. Fox was in October 25, 1975.

In early 1976, and perhaps during the year 1975, the plaintiff noticed that his monthly finance charges were being "compounded," that is, the computation of the average daily balance included unpaid and delinquent finance charges. Sometime in the spring of 1976, he notified G. Fox's

credit department that its calculations violated the Act and were inconsistent with the billing information supplied to consumers by the company. He demanded that the credit department stop this practice and that his account be adjusted accordingly. When the company refused to change its method of determining finance charges, the plaintiff registered a complaint with the Connecticut State Banking Commission.

After the state agency indicated it would not intervene in the dispute between the plaintiff and G. Fox, the plaintiff decided to institute his suit as a class action to force the company to abide by his interpretation of the relevant law. In order to make the "overcharge" apparent and understandable at trial, the plaintiff carefully and patiently reduced the balance due on his account through August 7, 1976, to $100. Thus each month thereafter the company's bills clearly reflected its "compounding practices" so that, at the end of one year, the total annual interest rate would reflect 12.67 per cent, rather than the 12 per cent stated on the bill.

The instant action was commenced on July 25, 1977. In a well-reasoned opinion, filed May 24, 1978, Magistrate Latimer denied plaintiff's motion for class certification.

## LIABILITY OF THE MAY COMPANY

In his complaint the plaintiff alleges that The May Company "makes all policy decisions and management decisions of the defendant G. Fox & Co., and is responsible for the ... violations" of the Act. At trial the plaintiff made no attempt to prove these allegations or to otherwise establish a case of liability against The May Company. Therefore, judgment shall enter in favor of The May Company.

## PLAINTIFF'S STATUS AS A "CONSUMER"

Relying on several serious inconsistencies in the record attributable to plaintiff, G. Fox argues that the plaintiff has failed to prove by a preponderance of the evidence that his charge account was used "primarily for personal, family or household" purposes, a prerequisite to jurisdiction under the Act,

15 U.S.C. § 1602(h). It contends that the plaintiff opened the account for business purposes to provide a basis for this lawsuit. See *Kenney v. Landis Fin. Group, Inc.,* 376 F.Supp. 852, 853–54 (N.D.Iowa 1974).

■ Resolution of the issue is troublesome, particularly in view of the contradictions between plaintiff's answers submitted under oath during discovery proceedings and his responses at trial to identical questions concerning his motivation in opening the charge account. While these discrepancies indeed reflect on the plaintiff's credibility, the Court is satisfied there is sufficient evidence in the record that plaintiff did not use the account primarily for business purposes and that the evidence, therefore, suffices to support jurisdiction under the Act.

## THE STATUTE OF LIMITATIONS

A consumer's rights under the Act are subject to a one year limitation period that begins to run "from the date of the occurrence of the violation." 15 U.S.C. § 1640(e).

Most of the reported cases which have considered the limitation provision of the Act have done so in the context of "close end" credit transactions. In those type of transactions, the finance charge is divided into the term of the loan and incorporated into time payments. As a general rule the disclosures required by the Act are revealed to the consumer at the time the contract for the extension of credit is executed or, at the very latest, at the time of performance. Thus there is a specific time at which a violation occurs and a court can use that occurrence as the point from which the limitation period begins to run. See, e.g., *Postow v. OBA Federal Savings & Loan Ass'n,* 627 F.2d 1370 (D.C.Cir.1980); *Rudisell v. Fifth Third Bank,* 622 F.2d 243 (6 Cir. 1980); *Stevens v. Rock Springs Nat'l Bank,* 497 F.2d 307 (10 Cir. 1974); *Wachtel v. West,* 476 F.2d 1062 (6 Cir.), cert. denied, 414 U.S. 874 (1973); *Davis v. Edgemere Fin. Co.,* 523 F.Supp. 1121 (D.Md.1981); *Partida v. Warren Buick, Inc.,* 454 F.Supp. 1366 (N.D.Ill.1978).

However, an open end credit arrangement, as in the present case, is distinguisha-

ble on several grounds from a close end transaction and necessitates a different rationale in applying the limitation provision. The Act defines "open end credit plan" in § 1602(i): "The term 'open end credit plan' means a plan under which the creditor reasonably contemplates repeated transactions, which prescribes the terms of such transactions, and which provides for a finance charge which may be computed from time to time on the outstanding unpaid balance." As a practical matter, when a consumer applies for and is issued a credit card under an open end credit plan, there is no extension of credit from a lender to a potential borrower, because no debt has yet accrued. With the "free ride" period permitted under most credit cards, it is only when the first finance charge is imposed that a consumer usually becomes aware that a violation of the Act has occurred. This may be many months after the application for and issuance of the card.

Under these circumstances it appears evident that the purpose of the Act—to ensure the "informed use of credit"—is best served if the starting point for the limitation period is deemed to be the date when there has been a finance charge which puts the consumer on notice that a violation has occurred. The leading case on this issue supports this approach. In *Goldman v. First Nat'l Bank of Chicago,* 532 F.2d 10 (7 Cir.), cert. denied, 429 U.S. 870, 97 S.Ct. 183, 50 L.Ed.2d 150 (1976), the plaintiff applied for, received, and used his BankAmericard for almost a year before he was assessed a finance charge for a late payment. At that point, he noticed a discrepancy between the imposition of the finance charge and the method used for calculating the finance charge set forth in the disclosure statement received by the plaintiff at the time the card was issued. Suit was commenced more than one year after the plaintiff received his credit card, but within a year of the time the violation came to plaintiff's attention. The district court ruled that the action was time-barred. 392 F.Supp. 214. The Court of Appeals for the Seventh Circuit reversed, holding that the statute did not run until the first finance charge was imposed. The court stressed that its ruling

depended on the unique nature of the open end credit plan where a determination of a violation of the Act is only possible when the consumer receives the first finance charge, which may be months after he receives and uses his credit card. *Goldman,* 532 F.2d at 22.

In the case *sub judice* the plaintiff admittedly perceived what he considered to be a violation of the Act more than one year before the commencement of the action. He was fully cognizant of his rights under the Act by the spring of 1976, and thereafter spent several months arranging charges and payments with G. Fox in order to have his account reflect an even $100 for evidentiary purposes at trial. These maneuvers have proved fatal to the plaintiff's cause of action. On the basis of the statute of limitations and relevant case law, it is clear that the plaintiff's action is barred.

Accordingly, judgment shall enter in favor of the defendants and against the plaintiff.