**Dennis B. NASH and Linda L. Nash, Plaintiffs-Appellants,**

v.

**FIRST FINANCIAL SAVINGS AND LOAN ASSOCIATION, Defendant-Appellee.**

No. 82–1874.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 29, 1982.

Decided March 17, 1983.

James N. Youngerman, Madison, Wis., for plaintiffs-appellants.

Michael J. Lund, Frisch, Dudek & Slattery, Milwaukee, Wis., for defendant-appellee.

Before WOOD, COFFEY and TIMBERS,* Circuit Judges.

TIMBERS, Circuit Judge.

This appeal presents once again questions of construction arising under the Truth in Lending Act and the regulations promulgated thereunder. The ultimate question is whether the district court erred in dismissing appellants' complaint which sought damages arising from an erroneous disclosure statement in connection with appellee's June 1, 1980 interest rate increase on a home mortgage. We hold that the court erred. We vacate that part of the judgment from which the instant appeal has been taken and remand the case to the district court for further proceedings.

I.

On April 28, 1972 appellants Dennis and Linda Nash entered into a mortgage loan agreement with appellee First Financial Savings and Loan Association ("Associa-

* Of the Second Circuit, by designation.

tion"), a Stevens Point, Wisconsin, financial institution, to finance the purchase of their home in that city. Among the provisions of the agreement, as incorporated in the Mortgage Note, was a clause that gave the Association the option of raising or lowering the rate of interest on the loan. This variable rate provision could be invoked by the Association after three years, on four months written notice.[1] The same clause also gave the borrowers the option of repaying the loan principal without penalty during the four month notice period preceding the effective date of any rate increase.

At the time the Mortgage Note was executed, in April 1972, the loan carried an annual interest rate of 8%. The rate remained the same for almost eight years, until 1980. Then, in a letter dated January 16, 1980, the Association notified the Nashes that it was exercising its option to raise the interest rate from 8% to 9%, effective June 1, 1980. The Association sent with its "Notice of Interest Adjustment" what it described as a "Truth in Lending" form,[2] which purported to reiterate the essential terms of the mortgage loan, including the variable interest rate provision. This form, however, included a clause that had not been in the 1972 agreement; it described a previously unstated limit on future rate increases: "... (b) The amount of the initial interest rate increase may not exceed 1% per annum and any subsequent increase may not exceed ½ of 1% per annum...." This was an inaccurate statement of the terms of the variable rate provision.[3]

After receiving notice of the increase, appellants did not exercise their option to repay without penalty. Consequently the interest rate on their loan rose to 9% on June 1, 1980. Seven months later, in a letter dated January 1, 1981, the Association informed the Nashes that another rate increase, from 9% to 11%, was in prospect for the following June 1. The January 1981 disclosure statement made no mention of any limit on future rate increases, in contrast to the January 1980 statement. The 2% increase obviously was inconsistent with the January 1980 statement of variable rate terms, which provided that succeeding increases would not exceed ½ of 1% per annum.

On May 14, 1981, shortly before this second rate increase was to take effect, appellants commenced this action for damages, claiming that the Association had failed to comply with the disclosure requirements of the Consumer Credit Protection (Truth in Lending) Act, 15 U.S.C. §§ 1601–67d (1976 & Supp. V 1981) ("the Act"), and the Federal Reserve Board regulations promulgated pursuant thereto, collectively known as "Regulation Z", 12 C.F.R. §§ 226.1–80 (1982). The original complaint alleged that the June 1, 1980 rate increase had not been accompanied by the requisite Truth in Lending disclosures, because the disclosure statement provided in January 1980 erroneously stated percentage ceilings on interest rate increases.

Subsequently the complaint was amended to allege inadequate disclosure in connection with the June 1, 1981 rate increase as well. The Association filed a motion to dismiss the amended complaint for failure to state a claim. Appellants filed a cross-motion for summary judgment. The district court, John C. Shabaz, *District Judge,* in a memorandum decision and order dated April 23, 1982, dismissed the complaint in its entirety, including the claims based on both the 1980 and the 1981 rate increases.

---

1. The Mortgage Note provision that describes the variable interest rate reads:

   "The interest rate provided herein may be increased or decreased at the option of the Association, with a corresponding adjustment in the required monthly payment. However, the Association shall not increase the rate of interest until after three years from the date of this note, and then only upon at least four months' written notice to the Promisors and Mortgagors, who may then repay the loan within such notice period without penalty."

2. This form had the following heading:
   "Loan Cost Disclosure Statement
   as required by Federal Reserve Regulation 'Z' "

3. The original mortgage loan agreement made no provision for a percentage ceiling on future interest rate increases. Note 1 *supra.*

*Nash v. First Financial Savings and Loan Ass'n,* No. 81–C–287 (W.D.Wis. April 23, 1982). The court reasoned that subsequent rate increases pursuant to a variable interest rate loan agreement were not "new transactions" calling for the issuance of Regulation Z disclosure statements. The court held that the disclosure statements which were provided by the Association in connection with the two rate increases were not required and that any inaccuracy therein did not violate the Act. The court dismissed as moot plaintiffs' motion for summary judgment.

This appeal has been taken from the judgment entered on the court's memorandum decision and order.

Appellants do not press their appeal from that part of the judgment which dismissed their claim regarding the allegedly inadequate disclosure in connection with the June 1, 1981 rate increase. They do press their appeal from that part of the judgment which dismissed their claim that issuance of the concededly erroneous disclosure statement in connection with the June 1, 1980 rate increase was a violation of the Act. We vacate and remand.

4. We explained in *Brown* the operation of this exception:

"Although section 226.8(b)(8) of the Regulation now governs the relationship between the disclosure requirements and the variable rate provisions, it deals only with transactions consummated on or after October 10, 1977. The only relevant authority in effect at the time of the December 5, 1972, transactions dealing with such provisions was Official Board Interpretation 226.810. That Interpretation provided:

'(a) In some cases a note, contract, or other instrument evidencing an obligation provides for prospective changes in the annual percentage rate or otherwise provides for prospective variation in the rate. The question arises as to what disclosures must be made under these circumstances when it is not known at the time of consummation of the transaction whether such change will occur or the date or amount of change.

(b) In such cases, the creditor shall make all disclosures on the basis of the rate in effect at the time of consummation of the transaction and shall also disclose the variable feature.

## II.

◼ Based on our recent decision in *Brown v. Marquette Savings and Loan Ass'n,* 686 F.2d 608 (7th Cir.1982)—decided subsequent to the district court decision in the instant case—we hold that the June 1, 1980 interest rate increase here was a "new transaction" within the meaning of 12 C.F.R. § 226.9(j) (1982), calling for issuance of a new disclosure statement. We squarely held in *Brown* that for variable rate loans entered into prior to 1977 any subsequent increase in the interest rate must be considered a "new transaction" subject to the disclosure requirements of Regulation Z. *Id.* at 612. The exception to this rule, we made clear, was for loans that complied at the time they were entered into (here 1972) with the then-controlling Official Board Interpretation 226.810, 12 C.F.R. § 226.810 (Rescinded October 10, 1977).[4] This Interpretation provided, *inter alia,* that subsequent increases of the interest rate pursuant to a variable rate loan would not be "new transactions" requiring the issuance of new disclosure statements, as long as detailed initial disclosures were made[5] and the subsequent increases were in line with the terms so set forth.

(c) If disclosure is made prior to the consummation of the transaction that the annual percentage rate is prospectively subject to change, *the conditions under which such rate* may be changed, and, if applicable, the maximum and minimum limits of such rate stipulated in the note, contract, or other instrument evidencing the obligation, such subsequent change in the annual percentage rate in accordance with the foregoing disclosures is a subsequent occurrence under § 226.6(g) and is not a new transaction.'

12 C.F.R. § 226.810 (Rescinded October 10, 1977).

The Board has consistently relied on this Interpretation as establishing that any rate increase pursuant to a variable rate provision constitutes a refinancing and thus a new transaction unless there has been compliance with the conditions of § 226.810(c)."

*Brown, supra,* 686 F.2d at 611 (citations omitted).

5. The initial disclosures required by § 226.810(c) include, most significantly, "the conditions under which [the interest] rate may be changed". To comply with § 226.810(c), and

Here there is no question that the detailed initial disclosures required by § 226.810(c) were not made. The disclosure statement provided by the Association in connection with the execution of the Mortgage Note in 1972 fell short of the standard required by 226.810(c) in several respects. Paragraph (c) requires that "the conditions under which such rate may be changed" must be disclosed, at least as a prerequisite for qualifying any later interest rate increase as "a subsequent occurrence . . . and . . . not a new transaction." Here the 1972 disclosure statement failed to set forth a number of important variable rate terms. The statement failed to mention, first, the requirement of four months notice prior to any interest rate increase, and, second, the Nashes' right to repay without penalty during the period between notification of the rate increase and the effective date of that increase.

Moreover, the explanation of the variable rate feature in the 1972 disclosure statement contained the term "interest rate", rather than "Annual Percentage Rate" as required by the statute. Failure to use the required term "Annual Percentage Rate" in the explanation of the variable interest rate, in itself, places the 1972 disclosure statement in non-compliance with 226.810(c) and therefore makes subsequent rate increases "new transactions". As we stated in *Brown,* "the defendant's failure to use the term Annual Percentage Rate in that portion of the December 5, 1972, disclosure statement relating to the variable rate provision, falls short of this standard of strict compliance. The improper terminology in the disclosure statement violates the requirements of 226.810(c) . . . and therefore the increases were new transactions within the meaning of section 226.8(j)." *Brown, supra,* 686 F.2d at 613 (citations omitted).

Since the delineation of the variable rate terms in the disclosure statement provided at the outset of the loan did not satisfy the requirements of 226.810(c), the standard

then in effect, the June 1, 1980 rate increase was a "new transaction" requiring the issuance of a new disclosure statement. Such statement was required to be made in accordance with the applicable disclosure guidelines of Regulation Z as set forth in 12 C.F.R. § 226.8(b)(8) (1982). Effective October 10, 1977, this regulation applied to all transactions consummated after that date. Therefore 226.8(b)(8) is the standard by which the disclosure statement issued in January 1980 must be judged.

■ The Association's January 1980 disclosure statement, issued in connection with the June 1, 1980 rate increase, was fatally defective under the standard of 226.8(b)(8). It gave an inaccurate description of limits on future rate increases, in contravention of the requirement that it disclose the actual conditions under which the rate could be increased, 226.8(b)(3)(i), and the true limitations on any future rate increases, 226.8(b)(8)(i)(B).

We hold that the Association therefore violated the Act by entering into a new transaction—the June 1, 1980 rate increase—without making the required disclosure of the variable rate terms. *Brown, supra,* 686 F.2d at 614 ("the defendants violated the Act by failing to accompany those new transactions with the requisite TIL disclosures.").

### III.

This brings us to the remaining question on this appeal—whether the Nashes' action under the Truth in Lending Act was barred by the Act's one year statute of limitations. 15 U.S.C. § 1640(e) (1976).

The statute requires that actions be commenced under the Act "within one year of the date of the occurrence of the violation." Here the Nashes commenced their action on May 14, 1981, well over a year after the

---

thus shield later rate increases from Regulation Z disclosure requirements, all the terms regarding future rate increases must have been disclosed at the outset of the loan. "[S]trict compliance with the required disclosures . . . is required." *Smith v. No. 2 Galesburg Crown Finance Corp.,* 615 F.2d 407, 416 (7th Cir.1980).

January 1980 [6] notification of the rate increase but less than a year after the June 1, 1980 effective date of that rate increase. We must determine whether one of these or some other date was the date upon which the violation occurred. This in turn requires a determination of what constituted the violation. If the violation was the issuance of a faulty disclosure statement in January 1980, then commencement of the action was not timely. If, on the other hand, the violation was the consummation of a new credit transaction on June 1, 1980 without making the required disclosures, the action was timely commenced within one year of the date of the violation.

We have held above that the June 1980 rate increase was · a new transaction for purposes of disclosure under Regulation Z. This means that the rate increase must be viewed in the same light as a refinancing or a completely new extension of credit, for "considering such increases as refinancings or new extensions of credit comports with the purpose of the TILA." *Brown, supra,* 686 F.2d at 612. We therefore turn to those decisions which have considered this question in the context of refinancing or new extensions of credit.

There is abundant authority for the proposition that a violation of the Act occurs when the new credit transaction is "consummated", or when credit is extended, without the requisite disclosure having been made. *E.g., Harmen v. New Hampshire Savings Bank,* 638 F.2d 280, 282 (1st Cir. 1981) ("We therefore agree . . . that '[t]here can be no violation of the Act until the transaction is consummated.'" (citations omitted)); *McCoy v. Franklin Savings Ass'n,* 636 F.2d 172, 176 n. 6 (7th Cir.1980) (no violation of Act until credit is accepted); *Dryden v. Lou Budke's Arrow Finance Co.,* 630 F.2d 641, 646 (8th Cir.1980) ("A TILA violation occurs . . . and the one-year limi-

tations period begins to run, when credit is extended through the consummation of the transaction between the creditor and its customer without the required disclosures being made."); *Rust v. Quality Car Corral, Inc.,* 614 F.2d 1118, 1119–20 (6th Cir.1980); *Bartholomew v. Northampton National Bank of Easton,* 584 F.2d 1288, 1296 (3d Cir.1980); *Waters v. Weyerhauser Mortgage Co.,* 582 F.2d 503, 505 (9th Cir.1978) ("There can be no violation of the Act until the transaction is consummated."); *Chevalier v. Baird Savings Ass'n,* 371 F.Supp. 1282, 1284 (E.D.Pa.1974).

Under the Act the Association was required to make disclosure before consummation of the new transaction—here the mortgage loan interest rate increase. 15 U.S.C. § 1639(b) (1976).[7] There could be no violation, however, until this new transaction was consummated, the preexisting contractual relationship of the parties notwithstanding. *Gary v. W.T. Grant Co.,* [1974–80 Transfer Binder] Consumer Credit Guide (CCH) ¶ 98,550, at 88,033 (N.D.Ga. Aug. 25, 1975) (where refinancing of loan was not agreed to by borrower, inadequate TILA disclosures in connection with the refinancing proposal did not violate the Act because the underlying transaction was never consummated).

■ Under the applicable provision of Regulation Z, consummation occurs at "the time a contractual relationship is created between a creditor and a customer . . . irrespective of the time of performance of either party." 12 C.F.R. § 226.2(kk) (1982). This is in accord with the Federal Reserve staff position, as expressed in an informal opinion: ". . . consummation occurs when a creditor agrees to extend credit and the customer agrees to utilize that credit." FRB Staff Opinion Letter No. 92, [Truth-in-Lending Special Releases 1969–74 Transfer Binder] Consumer Credit Guide (CCH)

---

**6.** The letter was dated January 16, 1980. Although the record does not disclose when the letter was received, we assume for purposes of this opinion that it was received sometime that month. Appellants have not argued that the date of receipt was unusually late or significant for any other reason. They state that the letter

was mailed to them "on or about January 16, 1980."

**7.** Repealed effective two years and six months from March 31, 1980. 15 U.S.C. § 1639(b) (Supp. V 1981).

¶ 30,147, at 66,061. The time of consummation, and not the time of dissemination of the inadequate disclosure statement, is the pivot on which a violation of the Act turns, since "the required disclosure under TILA [is] to be made as of the time that credit is extended ... and it is as of that time that the adequacy and accuracy of the disclosures are to be measured." *Bartholomew, supra,* 584 F.2d at 1296. The violation of the Act is not simply the inaccurate disclosure; it is the consummation of the new transaction without having made the required disclosure.

The Association argues that it was simply exercising its contractual right to raise the interest rate; consummation therefore could have occurred only in 1972 when the terms of the loan were settled. Alternatively, it argues that its unilateral action in notifying the Nashes of the rate increase in January 1980 was the consummation of any new transaction involving that rate increase. There was nothing to be consummated, so the Association's argument goes, after this unilateral action, the decision having been announced. Essentially these arguments represent an attempt to relitigate the issue conclusively determined in *Brown, supra.*

We recognize that there is some semantic difficulty, at least on the surface, in construing an interest rate increase as a bilateral transaction that can be consummated. It nevertheless is proper to view the June 1980 rate increase as a new transaction, with consummation occurring at the time the borrower "accepted" the new rate. In January 1980 appellants were simply given notice of a prospective increase in the rate of interest on their mortgage loan. Their loan agreement required that they be given four months notice of any such increase. This notice period was no mere formality. The Nashes had the right to repay the outstanding principal on the loan without penalty during this period. The four months notice also gave them an opportunity to determine whether more favorable credit terms could be obtained elsewhere.

If a better credit arrangement could be found, the Nashes were free to pursue it. The time between January and June 1 in effect was a "credit shopping" period expressly provided for by the terms of the loan agreement. Unless this construction is accepted, the four months notice and the penalty-free repayment provisions are meaningless. Appellants had until June 1 to repay the loan—without penalty—and so "decline" what essentially was an offer of credit on new terms, or they could do nothing and "accept" the new terms on June 1. The rate increase cannot be viewed as having been consummated while the Nashes had a meaningful opportunity to decline the continuation of their credit on the new terms. That opportunity existed until June 1.

We recognized under similar circumstances in *Brown* that "acceptance" of interest rate increases by borrowers is not a certainty, at least where the right to repay without penalty exists. "Consumers are likely to be shopping for credit when there is an interest rate increase pursuant to a variable rate provision, particularly when, as here, any prepayment penalty is waived during the notice period prior to the interest escalation." *Brown, supra,* 686 F.2d at 612.

■ Thus the transaction here—the increase in the interest rate—was not consummated, and the limitations period did not begin running, until the Nashes "accepted" the new terms by not repaying the loan prior to June 1. Since interest rate increases can be new transactions requiring disclosure under Regulation Z, it would be incongruous to view them as consummated on announcement notwithstanding the borrower's meaningful opportunity to "reject" the proposed new terms. Since the Nashes' 1980 rate increase was not consummated until they effectively agreed to accept the new terms by their failure to repay before June 1, we hold that the date of the consummation was June 1, 1980 and their May 14, 1981 commencement of this action was timely.[8]

VACATED AND REMANDED.

---

8. Appellants argue, on the basis of *Goldman v.*

*First National Bank of Chicago,* 532 F.2d 10

(7th Cir.1976), that the Association committed a continuing violation and that the statute of limitations did not start running until Jan. 27, 1981, at which time the Nashes received notice of the second rate increase—an increase inconsistent with the limits stated in the January 1980 disclosure statement. Since we hold for other reasons that the instant action was not time-barred, we do not reach this claim. We note, however, that our holding in *Goldman* was explicitly limited to open end credit plans. *Id.* at 22.