584 F.2d 1288
 49 A.L.R.Fed. 768
 Richard T. BARTHOLOMEW and Grace M. Bartholomew, his wife,
Robert Chamberlain and Sheila Chamberlain, his wife, James
T. Doehne, Harry T. Friebel and Geraldine Friebel, his wife,
Robert Hutnich and Gladys Hutnich, his wife, Robert Kirk and
Ruth Kirk, his wife, Conrad Meier and Mary Lou Meier, his
wife, George W. Storin and Ann Storin, his wife, William A.
Thorpe and Margaret Thorpe, his wife, Stanley Van Dusen and
Loweta Van Dusen, his wife, Robert Van Dusen, suing on
behalf of themselves and all others similarly situated, Appellants,
v.
NORTHAMPTON NATIONAL BANK OF EASTON, EASTON, PENNSYLVANIA,
Merchants National Bank of Allentown, Allentown,
Pennsylvania, American Bank and Trust Company of Reading,
Reading, Pennsylvania, National Realty Investment Corp.,
Newfoundland, Pennsylvania and Poconos Skyland Development
Company, Inc., Newfoundland, Pennsylvania, Individually and
trading as Castle Kress L & L Equities, Inc., Newfoundland,
Pennsylvania, Individually, and trading as Raven Hill
Forest, Wayne E. Matthews, Lloyd R. Dickinson and Leila M.
Dickinson, his wife, and William E. Brock, III, Defendants,
v.
DREHER TOWNSHIP, WAYNE COUNTY, PENNSYLVANIA, G. Leonard
Green, Individually and in his official capacity as Township
Supervisor, Burton H. Gilpin, Individually and in his
official capacity as Township Supervisor, Third-Party Defendants.
 No. 77-2217.
 United States Court of Appeals, Third Circuit.
 Argued May 1, 1978.
Decided Aug. 24, 1978.
 
 Edward C. Toole, Jr., Michael J. Glasheen, Anthony A. Geyelin, Clark, Ladner, Fortenbaugh & Young, Philadelphia, Pa., Dorrance R. Belin, Oliver, Price & Rhodes, Scranton, Pa., for appellants.
 Bernard S. Bergman, Philadelphia, Pa., for Northampton National Bank of Easton, Pennsylvania.
 Matthew J. Broderick, Dechert, Price & Rhoads, John E. Flaherty, Jr., Kathryn Delanty Portner, Philadelphia, Pa., for Merchants National Bank of Allentown, Pennsylvania.
 Marjorie O. Rendell, Richard C. Unger, Jr., Duane, Morris & Heckscher, Philadelphia, Pa., for American Bank and Trust Company of Reading, Pennsylvania.
 James Lewis Griffith, E. Parry Warner, Obermeyer, Rebmann, Maxwell & Hippel, Philadelphia, Pa., for William E. Brock, III.
 Before HUNTER and WEIS, Circuit Judges, and GERRY, District Judge.*
 OPINION
 JAMES HUNTER, III, Circuit Judge:
 
 
 1
 In this case plaintiffs, lot purchasers in a land development in the Pocono Mountains region of Pennsylvania, alleged that defendants in this appeal[1] violated provisions of the Interstate Land Sales Full Disclosure Act (Land Sales Act),[2] Consumer Credit Protection Act (Truth in Lending Act),[3] the National Bank Act[4] and state usury law.[5] On motion by the defendants, banks involved in the financing of the project and the land sales, as well as William Brock, sole shareholder of the corporate limited partner of the land developer, the district court dismissed certain of plaintiffs' claims pursuant to F.R.Civ.P. 12(b)(6) and granted summary judgment as to the rest. We affirm the district court's orders.
 
 
 2
 Plaintiffs are purchasers of unimproved lots in an unsuccessful recreational development known as Sherwood Forest in Wayne County, Pennsylvania. The development included two separately owned parcels. One was owned by Castle Kress, a limited partnership, which promoted the project and sold the lots in question. The second parcel was owned by another limited partnership, Raven Hill Forest, which hired Castle Kress to promote and sell lots as part of the Sherwood Forest development.
 
 
 3
 Castle Kress was composed of one general partner, National Realty and Investors Corp., a Pennsylvania corporation, and one limited partner, Poconos Skyland Development Company, Inc., a District of Columbia corporation. National Realty was solely owned and operated by Wayne Matthews, the driving force behind the development. Poconos Skyland, in turn, was solely owned by former United States Senator William Brock, who had owned the first tract of land in the development prior to the limited partnership agreement.
 
 
 4
 Most of the sales of land in the development were effected on an installment credit basis. Buyers from Castle Kress would make a down payment and sign an installment purchase agreement for the balance of the purchase price. Castle Kress assigned the instruments, pursuant to prearranged financing agreements, to one of the three bank defendants: Northampton National Bank of Easton, Pennsylvania, American Bank & Trust Company of Reading, Pennsylvania, or Merchants National Bank of Allentown, Pennsylvania. Further, the Northampton National Bank advanced funds to Castle Kress for development at the project site and held a mortgage, as a construction lender, on at least part of the project.
 
 
 5
 The Sherwood Forest development failed to mature. Township officials allegedly opposed the project, refusing to grant building permits, failing to approve plat maps, and not allowing the installation of proposed sewer and drainage systems. Further, the Administrator of Interstate Land Sales of the United States Department of Housing and Urban Development effectively halted further sales in Sherwood Forest on December 17, 1973, by administratively suspending the effectiveness of disclosure documents filed by Castle Kress under the Land Sales Act.
 
 
 6
 Additionally, in the midst of the development's difficulties, Castle Kress, its general partner National Realty, and National Realty's sole shareholder Matthews all suffered financial collapse and withdrew from the project. Northampton National Bank foreclosed its mortgage on the unsold portions of the project. All three defendant banks confessed judgment on the installment agreements executed by the plaintiff land purchasers.
 
 THE LAND SALES ACT COUNTS
 
 7
 The plaintiffs' claims against the banks and Brock involved misrepresentations and omissions in the "Statement of Record" and "Property Report" filed by Castle Kress under the Land Sales Act, as well as other statements made to lot purchasers.[6] In the complaint, the lot purchasers alleged that these defendants were "indirect sellers" within the meaning of the Act and that they were liable as aiders and abettors of the primary wrongdoers, including Castle Kress and Matthews. The complaint alleged that the defendants knowingly participated in the fraudulent scheme, were engaged in the planning of the project, and financially profited from their participation in the development of Sherwood Forest.
 
 
 8
 The district court held that the Land Sales Act, by its language, limited the class of persons against whom liability can be imposed to "developers" or "agents of developers". Finding that none of the defendants could be so characterized, the court entered summary judgment for all defendants on these counts.
 
 
 9
 The Land Sales Act provides for regulation of the sales of real estate lots in subdivisions by requiring disclosure of certain information about the property. Disclosure statements must be filed with the Department of Housing and Urban Development (the Statement of Record) and be provided to potential purchasers of the property (Property Reports). 15 U.S.C. §§ 1704, 1707.
 
 
 10
 Section 1709 of the Act[7] provides a private right of action for purchasers of lots against developers and agents of developers with respect to untrue statements and omissions of material facts in both the filed statement of record and the property report provided to the purchaser, as well as for violation of section 1703, the general antifraud provision of the Act. Section 1703 of the Act provides:
 
 
 11
 (a) It shall be unlawful for any developer or agent, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce, or of the mails
 
 
 12
 (1) to sell or lease any lot in any subdivision unless a statement of record with respect to such lot is in effect in accordance with section 1706 of this title and a printed property report, meeting the requirements of section 1707 of this title, is furnished to the purchaser in advance of the signing of any contract or agreement for the sale or lease by the purchaser; and
 
 
 13
 (2) in selling or leasing, or offering to sell or lease, any lot in a subdivision
 
 
 14
 (A) to employ any device, scheme, or artifice to defraud, or
 
 
 15
 (B) to obtain money or property by means of a material misrepresentation with respect to any information included in the statement of record or the property report or with respect to any other information pertinent to the lot or the subdivision and upon which the purchaser relies, or
 
 
 16
 (C) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a purchaser.
 
 
 17
 Both liability provisions are unambiguously directed toward the activities of developers and their agents. Under the definitional provision of the Act, a developer is one who "directly or indirectly, sells or leases, or offers to sell or lease, or advertises for sale or lease any lots in a subdivision." 15 U.S.C. § 1701(4). An agent is any person "who represents, or acts for or on behalf of, a developer" in selling or leasing efforts. Id. § 1701(5).
 
 
 18
 Plaintiffs do not allege that the banks and Brock can be characterized as direct sellers under the Act. Rather, they claim that each of the defendants, although not involved with sales of lots in Sherwood Forest, "actively participated" in management decisions concerning the development. Plaintiffs' contention is that the banks and Brock, as "planners, participants, and profit-makers", should be considered indirect sellers, and thus "developers", liable for any statutory violations of Castle Kress or the other actual developers in the project.
 
 
 19
 Initially, as the Supreme Court has stated, " '(t)he starting point in every case involving construction of a statute is the language itself.' " Ernst & Ernst v. Hochfelder, 425 U.S. 185, 197, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), Quoting Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 756, 95 S.Ct. 1917, 44 L.Ed.2d 539 (Powell, J., concurring). The Act clearly limits the imposition of liability to those who meet the definitions of developers or agents of developers. Developers are those who directly or indirectly engage in selling efforts. Thus, since the Act provides for liability for misstatements or omissions in the statutorily required Statement of Record and Property Report or in statements made to offerees of lots in a subdivision, logically the statute should be interpreted to include within its scope only those engaged in the selling effort. In Paquin v. Four Seasons of Tennessee, Inc., 519 F.2d 1105 (5th Cir. 1975), the court stated:
 
 
 20
 We think that the language of (§ 1709 of the Act) indicates that Congress intended the developer to be liable for its own acts and those of its agents, which is the usual rule, but it did not mean to scoop up every guide or salesman . . . and make them pay unless they, too, have the authority to sell and do so.
 
 
 21
 519 F.2d at 1111.
 
 
 22
 Further, we believe, as did the trial judge, that the reference to "indirect sellers" in the Act as defining who may be considered developers, can only be constituted as encompassing those who conduct their selling efforts through means other than direct, face-to-face contact with buyers, as, for example, through agents. There is no indication in the language of the statute or in the legislative history of the Act that an indirect seller is other than one who is involved in some manner in the selling efforts related to a land development project.
 
 
 23
 Plaintiffs have not alleged that the banks or Brock sold, offered to sell, or advertised to sell any lots in Sherwood Forest. Nor have they alleged that these defendants performed any of these activities through agents or other means. Consequently, no liability can be imposed on them as developers under the Land Sales Act. See Paquin v. Four Seasons of Tennessee, Inc., supra; Zachery v. Treasure Lake of Georgia, 374 F.Supp. 251 (N.D.Ga.1974). Thus we agree with the district court's granting summary judgment for defendants on this theory.
 
 
 24
 Plaintiffs further argue that even if the defendants cannot be held liable as "indirect sellers" within the meaning of the Act, nevertheless the case should be remanded for trial on the question whether the three banks and Brock were sufficiently involved in the transaction to be liable as "aiders and abettors" of Castle Kress and other defendants alleged to be the "primary wrongdoers" in the land sale scheme. The trial court held that no liability can be imposed for aiding and abetting under section 1709 of the Land Sales Act, and further, assuming that such a cause of action existed, plaintiffs failed to raise any material issue of fact as to whether defendants could be found liable.
 
 
 25
 The lot owners' aiding and abetting claim is based on McCown v. Heidler, 527 F.2d 204 (10th Cir. 1975), in which the court held that officers and directors of a corporate developer of a large real estate subdivision could be held liable as aiders and abettors of the corporation under the Land Sales Act. The court held that new configurations of fraudulent dealings are constantly conceived, and thus the statute should be read "flexibly, to effectuate its remedial purposes." 527 F.2d at 207, Quoting SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 195, 84 S.Ct. 275, 11 L.Ed.2d 237 (1968). In finding that a cause of action existed against the officers and directors of a corporate developer under a theory of aiding and abetting, the court analogized the "anti-fraud" provisions of the Land Sales Act to section 10(b) of the Securities Exchange Act of 1934,[8] and rule 10b-5 promulgated thereunder.[9] Since the court had found that an aiding and abetting claim could be raised under securities fraud provisions, it determined that the same kind of action could be maintained by victims of land fraud.
 
 
 26
 Plaintiffs also point to Timmreck v. Munn, 433 F.Supp. 396 (N.D.Ill.1977), in which the court denied motions to dismiss made by banks furnishing financing for lot purchases in a development. Relying on McCown, the court held that although banks engaged in the normal course of their business would be exempt from the Act, plaintiffs would be permitted to prove that the banks exceeded the norm and actively participated in or aided the perpetuation of the fraud, or acted in such a manner as to assist in the "luring" of purchasers for the development.
 
 
 27
 The district court determined that the language of sections 1703 and 1709 of the Land Sales Act differed considerably from that of section 10(b), especially with respect to the limited scope of liability imposed by the Land Sales Act for fraudulent misstatements and omissions. While the Securities Exchange Act's general anti-fraud section applies to "any person" who engages in prohibited practices in connection with the sale of securities, the Land Sales Act applies only to developers and their agents. Thus, the district court reasoned, the Land Sales Act provisions evinced a narrower congressional purpose and could not be reasonably extended, consistent with its language, to cover a broad spectrum of participants in land developments. The court found McCown to be distinguishable on its facts, for in that case, the defendants were "classic insiders" of the corporate developer, while the banks and Brock could not be seen as having relationships with Castle Kress or Matthews that would compare to the defendants' relationship to the developer in McCown.
 
 
 28
 We need not decide whether an aiding and abetting claim is available to plaintiffs under the Land Sales Act. Even if we were to follow the reasoning of McCown, as the plaintiffs have urged, we believe that the trial judge properly entered summary judgment for Brock and the banks.
 
 
 29
 The court in McCown believed that aiding and abetting liability could be established by proof that defendants provided "knowing assistance of or participation in a fraudulent scheme." McCown v. Heidler, supra, at 207, Quoting Kerbs v. Fall River Industries, Inc., 502 F.2d 731, 740 (10th Cir. 1975). Plaintiffs have asserted, without having submitted affidavits countering those submitted by defendants, that inferences could be drawn from depositions of Brock and officers of the banks as well as from documents obtained in discovery that raise sufficient issues of fact to defeat the summary judgment motions. They claim that the assistance rendered by these defendants to the primary violators of the Act was their silence and inaction during the period of time when lots were sold to plaintiffs by virtue of inaccurate and incomplete statements.
 
 
 30
 We do not believe that plaintiffs have raised any genuine issues of material fact. The material relied on by plaintiffs provides no indication that Brock or the banks were aware of misstatements and omissions in the disclosures and statements made to the lot purchasers. Further, none of the bases for imposing liability for silence and inaction contemplated in the Kerbs case have been demonstrated by plaintiffs. Thus, even if we were to follow McCown we believe that the trial court properly entered summary judgment for the banks and Brock.[10]
 
 THE USURY CLAIMS
 
 31
 The lot purchasers have contended that defendant banks committed usury in the financing of plaintiffs' lot purchases by taking assignments of the installment purchase agreements from the developer, Castle Kress. Their argument is that the banks provided the purchaser with loans or the use of money, and charged interest in excess of that allowed by law.
 
 
 32
 The claims against Northampton National and Merchants National arise under the National Bank Act, 12 U.S.C. §§ 85 & 86. That Act incorporates by reference the usury law of the state in which the national bank is located. Daggs v. Phoenix National Bank, 177 U.S. 549, 20 S.Ct. 732, 44 L.Ed. 882 (1900); First National Bank in Mena v. Nowlin, 509 F.2d 872 (8th Cir. 1975). The claim against American Bank & Trust, a state-chartered bank, is based directly on the Pennsylvania usury law. Thus, although the causes of action against the national banks are different from that against the state bank, all must be decided by reference to the same state laws.[11]
 
 
 33
 The district court held, as a matter of law, that the financing agreements entered into by the developer and the plaintiffs did not constitute loans or the use of money within the meaning of the usury statutes. We believe that the district court properly analyzed this issue, and affirm the dismissal of these counts of the plaintiffs' complaint.
 
 
 34
 The statutes in force at the times of the transactions involved here all set lawful rates of interest for "the loan or use of money." Defendant banks all contend the transactions were not loans, but instead were installment sales on credit.
 
 
 35
 Under Pennsylvania law, bona fide sales of Goods on credit do not constitute "loans" within the meaning of the usury statute. Equitable Credit & Discount Co. v. Geier, 342 Pa. 445, 21 A.2d 55 (1941); Equipment Finance, Inc. v. Grannas, 207 Pa.Super. 363, 218 A.2d 81 (1966). In Geier,supra, the court stated:
 
 
 36
 Of course, all sales or lease contracts which extend credit are, to a certain extent, akin to the making of loans, but where a greater charge is exacted in the case of a sale on credit than in a cash sale it is included in the selling price of the article. It being uniformly held that sellers are free to contract with buyers as to the terms and conditions of sales, the financing of sales of merchandise by the extension of credit has never been considered subject to the prohibition of usury or to regulations applicable to banking and loan transactions.
 
 
 37
 342 Pa. at 455, 21 A.2d at 58.
 
 
 38
 The district court reasoned that the theory of this distinction that in an installment sale the parties are free to agree to the price of credit above the price of the goods was equally applicable in credit land installment sales. We agree with the district court, and find support for the proposition in the legislation apart from the usury laws which regulates the price of credit in such sales. See 69 Pa.C.S.A. §§ 601 Et seq. (Motor Vehicle Sales Finance Act); Id. §§ 1101 Et seq. (Goods and Services Installment Sales Act). Indeed, the Pennsylvania legislature has placed ceilings on the price of credit in installment sales of real property in Allegheny and Philadelphia Counties, 68 Pa.C.S.A. §§ 902 Et seq., further indicating that the sales involved here are not subject to Pennsylvania's usury statutes. Thus we believe that plaintiffs have not stated causes of action under the National Bank Act or the state usury law.[12]
 
 THE TRUTH-IN-LENDING ACT CLAIMS
 
 39
 Plaintiffs contend that the district court erred in granting summary judgment in favor of the bank defendants as to plaintiffs' claims under the Truth-In-Lending Act, 15 U.S.C. §§ 1601 Et seq. (TILA). Plaintiffs' claims are based on section 1638(a)(10) of the Act, which requires that purchasers to whom credit will be extended be furnished with "a description of any security interest held or to be retained or acquired by the creditor in connection with the extension of credit, and a clear identification of the property to which the security interest relates."
 
 
 40
 In the disclosure statement, the plaintiffs were informed that the seller would retain title, security interest and lien until the required monthly payments and other amounts under the contract were paid. Further, the seller retained the power to confess judgment in the event of default by the purchaser. The banks, however, later confessed judgment against the purchasers in advance of any default.
 
 
 41
 The bank's motion for summary judgment was based on their contention that the TILA claims were barred by the statute's one year limitation on actions. 15 U.S.C. § 1640(e). The trial judge found that plaintiffs had commenced their action more than one year after the limitations period had begun to run, and that no facts supported the plaintiffs' contention that the motion should be denied on the grounds of claims of fraudulent concealment or estoppel to plead the statute.
 
 
 42
 The Truth-In-Lending Act requires that creditors make full disclosure prior to the extension of credit. Thus, the statute begins to run on the date that a contract to sell land is executed. Wachtel v. West, 476 F.2d 1062 (6th Cir.), Cert. denied, 414 U.S. 874, 94 S.Ct. 161, 38 L.Ed.2d 114 (1973). Plaintiffs' complaint was filed more than one year after the sales involved in the case. Consequently, it would appear that their action is untimely.
 
 
 43
 The lot purchasers, however, argue that the limitations period should not begin to run until they were given notice of the banks' actions in confessing judgment without prior default. They rely on Goldman v. First National Bank, 532 F.2d 10 (7th Cir.), Cert. denied, 429 U.S. 870, 97 S.Ct. 183, 50 L.Ed.2d 150 (1976), in which the court held that the limitations period does not begin to run with respect to an incomplete, inaccurate or misleading disclosure involving an open-ended credit plan until a finance charge has been imposed on the debtor.
 
 
 44
 We believe that Goldman is not applicable to the plaintiffs' claims, and that the statutory period began to run at the time that the installment land purchase contracts were entered into. That case, as the court noted, was limited to the unique nature of "open-ended credit transactions", in which credit terms are initially established at the time the account is opened, but no fixed amount of debt is insured at that time. Thus a bank credit card plan is "open-ended", in that purchases made on the card are added to the outstanding balance in the account, and a finance charge may be computed on an outstanding unpaid balance from time to time. See Id. 532 F.2d at 17 n.11. That situation is totally unlike the installment sales in this case. Plaintiffs entered into "closed-end" sales on credit of single parcels of land, in which the seller agreed to finance particular purchases by the debtor. In such transactions, the required disclosure under TILA are to be made as of the time that credit is extended, 15 U.S.C. § 1638(b), and it is as of that time that the adequacy and accuracy of the disclosures are to be measured.[13] Wachtel v. West, supra. Plaintiffs also argue that even if the period of limitations should be held to have commenced at the time at which the installment land contracts were executed, nevertheless their action should be allowed to proceed on either of two grounds. First, they contend that defendant banks fraudulently concealed their violation of the Act. Second, they argue that the defendants, by their conduct, caused plaintiffs to delay filing suit on their claims beyond the statutory period. Thus they assert that defendants should be estopped from raising the statute of limitations as a bar to this action.
 
 
 45
 Having reviewed the record and the facts alleged by plaintiffs in opposition to the motion for summary judgment, we are convinced that the trial court did not err in finding that no factual issues existed to be tried. No arguable basis exists for plaintiff's fraudulent concealment contention. Also, the facts alleged by plaintiffs do not, as a matter of law, constitute such conduct that would estop the banks from raising the bar of the statute of limitations. See Burke v. Gateway Clipper, Inc., 441 F.2d 946 (3d Cir. 1972). Thus we agree with the grant of summary judgment on the TILA claims.
 
 
 46
 The judgment of the district court will be affirmed.
 
 
 
 *
 Honorable John F. Gerry, United States District Judge for the District of New Jersey, sitting by designation
 
 
 [1]
 The orders dismissing the claims against these defendants were certified as final by the district court pursuant to Fed.R.Civ.P. 54(b). At the time this appeal was filed, plaintiffs' claims against the developer and others as the "primary wrongdoers" under the Interstate Land Sales Full Disclosure Act had not proceeded to judgment. In certifying the appeal, Judge Fullam fully set forth the reasons justifying appeal of these claims at this stage of the litigation in accord with this court's opinion in Allis-Chalmers Corp. v. Philadelphia Electric Co., 521 F.2d 360 (3d Cir. 1975)
 
 
 [2]
 15 U.S.C. §§ 1701 Et seq
 
 
 [3]
 15 U.S.C. §§ 1601 Et seq
 
 
 [4]
 12 U.S.C. §§ 21 Et seq
 
 
 [5]
 41 Pa.C.S.A. § 3
 
 
 [6]
 The false statements alleged by plaintiffs in the Statement of Record and the Property Report included the following assertions: that plat maps had been approved by township authorities; that no litigation was pending that would affect the development; that a central sewer system would be built at the project site; that the township had approved the sewage system plan; that no drainage or fill would be required on any of the lots; and that an escrow account established at the Northampton National Bank assured completion of sewage and water facilities, as well as roads in the development. Material omissions from the required disclosure documents claimed by plaintiffs included the failure to disclose that roads within the development were not complete, nor uniformly passable by automobile, and the failure to reveal that special building techniques would be required on some of the lots in the project. Further, plaintiffs alleged that the developers falsely stated to lot purchasers that the developers had the capacity to provide an "amenity and activity package", including roads, sewer system, water system, swimming pool, ski slope, golf course, and other features. Finally, plaintiffs alleged that the developers misled them by stating that "the participation and support of Senator Bill Brock of Tennessee assured the plaintiff purchasers of a safe and sound purchase." Amended Complaint, P 39
 
 
 [7]
 Section 1709 states:
 (a) Where any part of the statement of record, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein, any person acquiring a lot in the subdivision covered by such statement of record from the developer or his agent during such period the statement remained uncorrected (unless it is proved that at the time of such acquisition he knew of such untruth or omission) may, either at law or in equity, in any court of competent jurisdiction, sue the developer.
 (b) Any developer or agent who sells or leases a lot in a subdivision
 (1) in violation of section 1703 of this title, or
 (2) by means of a property report which contained an untrue statement of a material fact or omitted to state material fact required to be stated therein, may be sued by the purchaser of such lot.
 
 
 [8]
 15 U.S.C. § 78j(b)
 
 
 [9]
 17 C.F.R. § 240.10b-5
 
 
 [10]
 Our holding on plaintiffs' aiding and abetting claim would be unchanged were we to apply cases of this circuit outlining the scope of aiding and abetting liability under the Securities Exchange Act of 1934. See Rochez Brothers, Inc. v. Rhodes, 527 F.2d 880 (3d Cir. 1975); Landy v. FDIC, 486 F.2d 139 (3d Cir. 1973)
 
 
 [11]
 During the time period of the transactions involved in this case, three different usury statutes were in force. 41 Pa.C.S.A. § 3 (1973); Act of June 9, 1972, No. 106 § 1; Act of July 20, 1968, No. 198 § 1. All impose interest ceilings for the "loan or use of money."
 
 
 [12]
 See also 1974 Op. Att'y. Gen. of Penna. No. 29. Plaintiffs also argue that even if the land sales transactions in question were not loans as to which the usury laws applied at the time they entered into the contracts, the close relationship between the banks and Castle Kress converted the contracts into loans. We find no merit in this contention
 
 
 [13]
 Indeed, we doubt, as did the district court, whether the actions of the bank could properly be considered TILA violations. Rather, it appears that the banks' actions in confessing judgment involved the exercise of a remedy not reserved to the banks by the contracts. 15 U.S.C. § 1634 states:
 if information disclosed in accordance with this part is subsequently rendered inaccurate as the result of any act, occurrence, or agreement subsequent to the delivery of the required disclosures, the inaccuracy resulting therefrom does not constitute a violation of this part.
 See 12 C.F.R. § 226.6(g).
 We need not resolve this issue, since we believe the statute of limitations clearly bars the suit under TILA.