**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A16-0239**

State of Minnesota,
Appellant,

vs.

Minnesota School of Business, Inc.
d/b/a Minnesota School of Business, et al.,
Respondents.

**Filed September 12, 2016**
**Affirmed**
**Ross, Judge**

Hennepin County District Court
File No. 27-CV-14-12558

Lori Swanson, Attorney General, Alan I. Gilbert, Solicitor General, Kathryn I. Landrum, Assistant Attorney General, Adam H. Welle, Assistant Attorney General, St. Paul, Minnesota (for appellant)

Joseph W. Anthony, Brooke D. Anthony, Daniel R. Hall, Amelia R. Selvig, Anthony Ostlund Baer & Louwagie P.A., Minneapolis, Minnesota (for respondents)

Considered and decided by Stauber, Presiding Judge; Ross, Judge; and Johnson, Judge.

**S Y L L A B U S**

I.   Minnesota Statutes section 334.16 (2014) adopts the definitions and provisions of the federal Truth in Lending Act and Regulation Z that were in effect on June 5, 1971, but it does not adopt any subsequent amendments to them.

II.  Minnesota Statutes section 56.01(a) (2014) does not require a lender engaged in the business of making loans under $100,000 to obtain a license unless the interest rate the lender charges is greater than the rate otherwise permitted by law.

**O P I N I O N**

**ROSS**, Judge

This case involves two for-profit colleges that offer private educational loans to their students who cannot cover their tuition by other means. The state sued the schools, arguing that their loans, which carry interest rates as high as 18%, are usurious and that the schools are engaged in unlicensed lending in violation of the Minnesota Regulated Loan Act. The district court granted summary judgment favoring the schools and dismissed the claims. We affirm the dismissal of both claims. Because the schools' loans are open-end credit plans under Minnesota Statutes section 334.16, the schools may charge up to 18% annual interest. And because this interest rate is permitted by law, the Minnesota Regulated Loan Act does not require the schools to be licensed by the department of commerce.

**FACTS**

Minnesota School of Business and Globe University are for-profit colleges providing postsecondary education programs at campuses around Minnesota and through the internet. These schools together offer more than 30 degree and certificate programs in various subjects and have enrolled about 28,000 students since 2009. The schools charge up to $42,000 for an associate's degree and up to $89,000 for a bachelor's degree. They operate on a tuition-funded basis, meaning their operating costs are covered by student payments rather than government subsidies and private donations.

The schools give prospective students information about tuition funding options, including grants, scholarships, federal student loans, and private student loans. The schools recommend that students first avail themselves of grants and scholarships, followed by

2

federal student loans. If students exhaust those means and find that they do not meet their tuition requirements, the schools encourage them to consider private loans. The schools directly offered "institutional loans" through two sources: the Educational Opportunities (EdOp) program (which was discontinued in 2012) and the Student Access (StA) program. Since 2009, approximately 6,000 students have financed their tuition in part by institutional loans.

To obtain an institutional loan, students submit a single application covering an entire academic year and can use the loan funds only for direct education expenses. The schools do not disburse the funds directly to a borrowing student but instead credit the student's account in the amount needed to cover the student's outstanding tuition balance. The programs limit each loan by a specific dollar amount. (Students historically could borrow up to $7,500 per year until 2014 under both programs and currently $3,000 under the StA program.) The programs disburse the loan proceeds at three designated points in the academic year, each corresponding to a particular academic period. If the qualifying student's account demonstrates that the authorized disbursement amount is unnecessary, the schools have discretion to refuse a disbursement. Although students may apply for loans in successive years, the schools are not bound to renew any loan.

The schools impose a finance charge on any unpaid balance on the institutional loans. The EdOp loans accrue interest up to 18% annually, and the StA loans carry either an 8% or 12% annual interest rate. The repayment obligation begins promptly, even before the borrower completes her education, and in the event of a default, the schools may charge

3

late fees and collection costs. Students can repay their unpaid balance ahead of schedule without penalty.

The state sued the schools in July 2014. The state alleged that, since January 1, 2009, the schools' solicitation of students for these loans has constituted deceptive practices and false statements, violating the Minnesota Consumer Fraud Act and the Minnesota Deceptive Trade Practices Act. Minn. Stat. §§ 325F.68–.694; Minn. Stat. §§ 325D.43–.48 (2014). The state amended its complaint to add that the schools are engaged in unlicensed lending in violation of the Minnesota Regulated Loan Act under Minnesota Statutes sections 56.001–.26 (2014), and that their loans carry usurious interest rates in violation of Minnesota Statutes section 334.01 (2014). The state asked the district court to enjoin the schools from issuing institutional loans, void or cancel the existing loans, and require the schools to repay to their students all money the students paid on the loans.

Both parties moved the district court for summary judgment. The district court denied both parties' motions as to the consumer-protection claims and set those claims for trial. The district court granted the schools' motion for summary judgment on the lending claims. In dismissing those claims, the court held that the institutional loans are not usurious because they are open-end credit plans under Minnesota Statutes section 334.16, allowing the schools to charge annual interest rates as high as 18%. The district court also held that the schools are not required to be licensed under Minnesota Statutes section 56.01(a) because their loans do not impose an otherwise unpermitted interest rate.

The state requested permission to file a motion to reconsider under Minnesota Rule of General Practice 115.11, which the district court denied. The state appealed the dismissal

of the lending claims, and this court issued an order questioning jurisdiction to hear the appeal. After informal briefing, a special-term panel concluded that the district court's order was appealable under Minnesota Rule of Civil Appellate Procedure 103.03(b) because it denied an injunction. We now address the merits of the state's appeal.

## ISSUES

I.    Are the schools' institutional loans open-end credit plans under Minnesota Statutes section 334.16 and therefore not usurious?

II.    Are the schools engaged in unlicensed lending in violation of the Minnesota Regulated Loan Act?

## ANALYSIS

We first address the parties' disagreement regarding the appropriate standard of review. The district court was presented with cross-motions for summary judgment. And this court reviews summary judgment decisions de novo to determine whether the district court properly applied the law and whether genuine issues of material fact exist. *Riverview Muir Doran, LLC v. JADT Dev. Grp., LLC*, 790 N.W.2d 167, 170 (Minn. 2010). The schools argue that we should review under the standard applied to denials of requests for permanent injunctions because the special-term order accepting jurisdiction stated that the appeal was "limited to the denial of injunctive relief with respect to [the state's] lending law claims." *See Williams v. Nat'l Football League*, 794 N.W.2d 391, 395 (Minn. App. 2011) (reviewing the denial of a permanent injunction for an abuse of discretion), *review denied* (Minn. Apr. 27, 2011).

The parties do not offer any caselaw addressing what standard of review generally applies to the denial of a request for an injunction for claims dismissed on partial summary

5

judgment, but we conclude we need not decide the question in this case. The only issues before this court are whether, as a matter of law, the institutional loans are usurious and whether the schools are engaged in unlicensed lending. The district court resolved both issues by applying statutes to undisputed facts, which leaves us with purely legal questions that we answer de novo. *City of Morris v. Sax Invs., Inc.*, 749 N.W.2d 1, 5 (Minn. 2008).

## I

The state argues that the schools' institutional loans are usurious. The supreme court has summarized the four elements a court must find to conclude that a transaction is usurious:

> (a) A loan of money or forbearance of a debt; (b) an agreement between the parties that the principal shall be repayable absolutely; (c) the exaction of a greater amount of interest or profit than is allowed by law; and (d) the presence of an intention to evade the law at the inception of the transaction.

*Rathbun v. W. T. Grant Co.*, 300 Minn. 223, 230, 219 N.W.2d 641, 646 (1974).

The parties dispute only the interest-rate element. Minnesota's usury statute generally prohibits charging interest at more than 8% annually. *See* Minn. Stat. § 334.01, subd. 1. But there are exceptions. *See Rathbun*, 300 Minn. at 231 n.3, 219 N.W.2d at 647 n.3 (listing statutory exceptions). The schools argue that their institutional loans fit one of the exceptions. They maintain that the loans are exempt from the 8% interest ceiling because they are open-end credit plans under Minnesota Statutes section 334.16. Under that provision, lenders may charge up to 18% annual interest on open-end credit plans. Minn. Stat. § 334.16, subd. 1(a)–(b). Because 18% is the highest interest rate charged on the loans, if they qualify as open-end credit plans, they would not be usurious.

6

The open-end-credit exception applies under the following qualification:

> The sale is a consumer credit sale pursuant to an open end credit plan, agreement or arrangement between the buyer and seller under which (1) the seller may permit the buyer to make purchases from time to time from the seller or other sellers, (2) the buyer has the privilege of paying the balance in full or in installments, and (3) a finance charge may be computed by the seller from time to time on an outstanding unpaid balance.

Minn. Stat. § 334.16, subd. 1(a). Our caselaw identifies additional characteristics of open-end credit, including the absence of a fixed amount of debt at the time an account is opened, and the carrying forward of account balances with interest. *John David Contracting, Inc. v. Brozek*, 535 N.W.2d 397, 398 (Minn. App. 1995) (citing *Wise Furniture v. Dehning*, 343 N.W.2d 26, 29 (Minn. 1984)). One of the parties has suggested that federal regulatory law adds a twist to our analysis, so we turn to see how it fits.

***The Truth in Lending Act and Regulation Z***

The state argues that the schools' institutional loans are not open-end credit plans because they fail to meet the definition of open-end credit contained in the federal Truth in Lending Act (TILA) and Regulation Z. The district court did not expressly answer this issue. The record informs us why this is so: the state never briefed the issue in the district court and did not mention it until the oral argument. But because the issue was presented to the district court and argued by both parties, and because the state highlighted the issue again in its request to file a motion to reconsider, we choose in our discretion to review the issue. *See Fin Ag, Inc. v. Hufnagle, Inc.*, 700 N.W.2d 510, 520 (Minn. App. 2005) (reviewing issue that was raised for the first time at summary judgment hearing), *aff'd on other grounds*, 720 N.W.2d 579 (Minn. 2006). Our decision to review the issue is

particularly weighted by our understanding that leaving the question open may also invite unnecessary additional litigation between the same parties on future loans.

The federal law is introduced into the matter of state law because section 334.16 expressly adopts the definitions and provisions found in TILA and Regulation Z. Minn. Stat. § 334.16, subd. 2. But it does so in closed rather than open fashion, declaring specifically that it adopts the definitions and provisions found in TILA and Regulation Z "as in effect on June 5, 1971." *Id.* The parties dispute whether amendments to federal law after that date also apply under section 334.16. Resolving that dispute is determinative because the current definition of open-end credit in Regulation Z requires that credit be "generally made available to the extent that any outstanding balance is repaid," 12 C.F.R. § 1026.2(a)(20)(iii) (2016), and the schools concede that their loans would not provide an additional extension of credit if a student were to pay down the loan at some point in a given period. The 1971 definition imposed no such requirement. 12 C.F.R. § 226.2(r) (1971). So if the state is correct that section 334.16 adopts TILA and Regulation Z amendments not only as those provisions existed in June 1971 but also as they exist today, the schools may not rely on the open-end-credit exception to charge rates above 8%, and the loans are usurious under state law.

The state cites Minnesota Statutes section 645.31, subdivision 2 (2014), to support its position that Minnesota law adopted the federal provisions as those provisions might be amended at any time. This statute provides, "When an act adopts the provisions of another law by reference it also adopts by reference any subsequent amendments of such other law, except where there is clear legislative intention to the contrary." Minn. Stat. § 645.31,

8

subd. 2. The state maintains there is no "clear legislative intent[ion] to the contrary" here, so that the subsequent amendments to federal law were adopted by the statutory reference to federal law. We cannot accept this construction.

The phrase "as in effect on June 5, 1971" informs us that the legislature intended to fix the definition of open-end credit as the term was defined by the referenced federal law in effect on the specified date. The legislature has elsewhere used this language when it incorporated federal law by reference. *See, e.g.*, Minn. Stat. § 168.346, subd. 1 (2014) (enacted in 2005 and incorporating 18 U.S.C. § 2721 "as in effect on May 23, 2005"); Minn. Stat. § 461.20(a) (2014) (defining "child-resistant packaging" consistent with 16 C.F.R. § 1700.15(b)(1) "as in effect on January 1, 2015"). Although the parties have not offered any caselaw interpreting this phrase, the state urges us to construe the statute liberally in favor of consumers. *See Boubelik v. Liberty State Bank*, 553 N.W.2d 393, 402 (Minn. 1996). But we do not construe the statute in any way other than what it says if the legislative intent is clear from the statute's unambiguous language. *Larson v. State*, 790 N.W.2d 700, 703 (Minn. 2010). And in this case, the language "as in effect on June 5, 1971" is unambiguous.

Challenging the plain-language approach, the state points to caselaw from this court applying post-1971 versions of TILA when analyzing whether a transaction is an open-end credit plan under section 334.16. *See Peterson v. Gustafson*, 584 N.W.2d 660, 662 (Minn. App. 1998) (citing an amended TILA definition of open-end credit), *review denied* (Minn. Nov. 17, 1998); *Brozek*, 535 N.W.2d at 398 (same); *see also Am. Accs. & Advisers, Inc. v. Hendrickson*, 460 N.W.2d 83, 84 n.1 (Minn. App. 1990) ("For analysis of Minn. Stat.

9

§ 334.16 in this case, we incorporate and apply the generally accepted phraseology currently embodied in the federal statute."). The state is correct that this court looked to federal law after 1971 in those cases, but the issue we face was never analyzed, and it indeed seems immaterial in those cases. None of them considered an open-end-credit characteristic like the replenishing-credit requirement found in the current Regulation Z definition. *See* 12 C.F.R. § 1026.2(a)(20)(iii). Without calling into question the propriety of this court's referring to post-1971 federal law in those cases, we decline to follow those references as dicta or as otherwise undeveloped.

The state also highlights what it believes is a contradiction between the schools' loan documentation and their argument here that the loans are open-end credit plans. Regulation Z requires lenders to provide certain disclosure statements for private education loans at the time the loans are solicited, approved, and accepted. 12 C.F.R. § 1026.47 (2016); *see also* 12 C.F.R. § 1026.46(b)(5) (2016) (defining "private education loan" to be an extension of credit issued by a private education lender expressly for postsecondary educational expenses, but not including open-end credit plans). These disclosures inform borrowers about significant aspects of the loans, including interest rates, fees, repayment terms, cost estimates, and alternatives to private education loans. *See* 12 C.F.R. § 1026.47. In addition to the disclosures, lenders must provide a self-certification form to be signed and returned by the borrower before a loan may be issued. *See* 12 C.F.R. § 1026.47(a)(8); 20 U.S.C. § 1019d (2012). The schools here provided students with the required disclosure statements and self-certification form. The self-certification form indicates that the loan relates to a "private education loan" and defines the term to exclude an extension of credit

10

under an open-end credit plan. In short, as the state points out, the school informs the students in these disclosures that the loans *are not* part of an open-end credit plan, but the schools now argue to us that the loans *are* part of an open-end credit plan.

On first impression, the contradiction is troubling. But on a closer look, the apparent contradiction is not fatal to the schools' position. The disclosure documents, on their face, indicate that they are provided pursuant to TILA's requirements. As the parties have recognized, those requirements have changed over time. So the loans may not (and apparently do not) qualify as open-end credit plans under *federal* law as the law exists today. The schools make their federally required disclosures to students based on existing federal law. But this case presents us with the different question: whether the loans qualify as open-credit plans under *Minnesota* law. And the answer to that question is not decided by federal law, but by Minnesota law, which expressly defines open-credit plans under the terms of specifically referenced federal law "as in effect on June 5, 1971." Whether the loans satisfy the current definition of Regulation Z is therefore irrelevant to whether the schools' loan programs fall within the open-end-credit exception under Minnesota law.

The state implies that failing to adopt subsequent amendments to TILA and Regulation Z essentially ignores the federal preemption afforded by the Supremacy Clause of the Constitution. U.S. Const. art. VI, c1. 2. We do not address the issue, however, because it is not properly before us, the state having raised it for the first time in its reply brief to this court. *See Wood v. Diamonds Sports Bar & Grill, Inc.*, 654 N.W.2d 704, 707 (Minn. App. 2002), *review denied* (Minn. Feb. 26, 2003).

11

We also are unconvinced by the state's argument that principles of contract law require the schools to be bound by the language of the disclosures and the self-certification form. It is true that, in breach-of-contract cases, courts will "enforce the agreement of the parties as expressed in the language of the contract." *City of Duluth v. Fond du Lac Band of Lake Superior Chippewa*, 843 N.W.2d 577, 581 (Minn. 2014) (quotation omitted). But this is not a contract dispute. And as we have already said, the self-certification disclosure involves the meaning of open-end credit under current federal law, not open-end credit as defined in section 334.16.

We hold that Minnesota Statutes section 334.16 is unambiguous and does not adopt amendments to TILA or Regulation Z made after June 5, 1971. Because section 334.16 and the TILA and Regulation Z definitions in force on that date do not contain the replenishing-credit requirement that is included in federal law only after that date, the schools' loans are not prohibited from qualifying as open-end credit plans on that basis.

***Other Open-End-Credit Characteristics***

We conclude that the loans also satisfy the open-end-credit characteristics identified in section 334.16 and in our caselaw.

Regarding the carry-forward characteristic, the balance of each loan grows as disbursements are made throughout the academic year, and a monthly finance charge is imposed on the outstanding balance. The state argues that the loans do not really carry forward because they provide for a maximum repayment period. The only authority the state cites in support is a consumer credit treatise using the example of a credit-card account and noting that "[t]here is no set number of payments that the consumer will make on the

12

account." Carolyn L. Carter, et al., *Consumer Credit Regulation* § 1.5.2 (2d ed. 2015). But the schools' loans are not credit-card accounts. And although there is a date by which the loans must be fully repaid, the number of payments is not set, and students may pay off their loans early at any time. Because students have the option to allow the unpaid balance to carry forward and accrue interest, the loans satisfy the carry-forward characteristic.

The loans also do not provide a fixed amount of debt at the time they are approved. It is true that the loans indicate a maximum borrowable amount, but the borrower can draw on the loans only as necessary to cover any unpaid tuition balance after other sources of funding have been exhausted. The amount disbursed therefore might not reach the stated maximum. When the school issues the loan, it is unknown whether the student will use all, some, or none of the available credit. *See Peterson*, 584 N.W.2d at 663 (finding no fixed debt when attorney did not agree to provide representation for a specific fee and instead charged an hourly rate); *cf. Brozek*, 535 N.W.2d at 398 (holding that a construction contract was not an open-end credit plan because it "had a specific price set out in its original form, which was only amended once"). The state maintains that the loans cannot satisfy this characteristic because they include an estimated finance charge, which it maintains would be impossible to calculate if the debt were not fixed. But the estimated finance charge is not based on a fixed amount of debt; rather, it is based on the total possible amount. What amount of debt is ultimately incurred cannot be determined when the loan is issued.

Also favoring the schools' position, the schools permit students to "make purchases from time to time." Minn. Stat. § 334.16, subd. 1(a); *see also Peterson*, 584 N.W.2d at 662 (finding open-credit plan when parties engaged in "repeated transactions"). Although each

13

loan is limited to one academic year and the schools are not obliged to issue loans for any additional year, they do allow students to receive disbursements on three different occasions. At oral argument, the parties identified a potential factual dispute regarding whether the students must ask to receive a disbursement, or whether disbursements occur automatically. Our review of the record informs us that no fact dispute exists on this point; students lack authority over the disbursements. Nothing in the record suggests that a student must do anything to receive funds on the disbursement dates after completing the loan application. But this does not mean that the purchases-from-time-to-time characteristic is unmet here. Students do in effect make "purchases" on the loan during any period by enrolling in classes that they have not by other means paid for. Although three disbursements (and therefore three purchases—one per academic period) is the most one can make under any individual loan agreement, our caselaw does not require that the number of purchase opportunities must be any particular amount. *Compare Am. Accs. & Advisers, Inc.*, 460 N.W.2d at 85 (finding that a single sale of funeral services did not constitute an open-end credit plan), *with Peterson*, 584 N.W.2d at 662 (finding repeated transactions when attorney represented client in a marriage dissolution and two post-dissolution actions). Although this factor presents a close call, because the loans permit students to receive funds by continuing to enroll in classes and thereby draw credit up to three times annually as needed, we hold that the loans satisfy the purchases-from-time-to-time characteristic.

The state argues finally that the institutional loans are not open-end credit plans because the schools have the authority to "call" the loans. The issue is forfeited because it

14

was not presented to or considered by the district court. *Thiele v. Stich*, 425 N.W.2d 580, 582 (Minn. 1988).

## II

The state argues that the schools are engaged in the business of making loans and therefore the Minnesota Regulated Loan Act requires they be licensed by the department of commerce. The controlling licensure provision of the act states as follows:

> Except as authorized by this chapter and without first obtaining a license from the commissioner, no person shall engage in the business of making loans of money, credit, goods, or things in action, in an amount or of a value not exceeding [$100,000], and charge, contract for, or receive on the loan a greater rate of interest, discount, or consideration than the lender would be permitted by law to charge if not a licensee under this chapter.

Minn. Stat. §§ 56.01(a), .131, subd. 1(a); *see also* Minn. Stat. § 56.002 (excluding "banks, savings associations, trust companies, licensed pawnbrokers, [and] credit unions" from the licensure requirement). The act permits licensed lenders to charge one of two interest rates, either (1) up to 21.75% annual interest, or (2) 33% interest on the first $1,125 of unpaid principal and 19% on the remaining unpaid principal above that amount. Minn. Stat. §§ 56.131, subd. 1(a); 47.59, subd. 3(a) (2014).

The parties do not argue over whether the schools' institutional loan programs rendered them "engaged in the business of making loans" (the statute does not define what degree of lending activity constitutes engaging in the business) or that the schools are unlicensed. Instead they argue over what circumstances require licensure. The state argues that section 56.01(a) requires *all* lenders making loans under $100,000 to first obtain a license from the department of commerce, regardless of the interest rates charged. The

15

schools argue that the licensure requirement applies only when loans are issued at rates above what would otherwise be permitted under the usury statute or its exceptions. The district court agreed with the schools' interpretation, holding, "Chapter 56 only applies where the loans in question charge an interest rate that is otherwise unpermitted."

No appellate case construes the licensure requirement in section 56.01(a). We believe that the schools offer the better interpretation. The state's interpretation misses the plain language. The state overlooks the word "and" and therefore overlooks its attached phrase: "*and* charge, contract for, or receive on the loan a greater rate of interest . . . *than the lender would be permitted by law to charge if not a licensee under this chapter.*" Minn. Stat. § 56.01(a) (emphasis added). The conjunction "and" requires us to construe the language that follows it as a limitation on the otherwise sweeping requirement that no lender may engage in the business of making loans "without first obtaining a license from the commissioner." *See id.* When the conjoined clauses are read together, their plain language requires licensure only when lenders seek to issue loans at interest rates above what would otherwise be permitted under the usury statute or an exception to that statute. The state's interpretation would have us excise 34 words from the statute. Our authority is limited to applying the statute as the legislature has written it.

The state argues for an ambiguity and for us to liberally interpret the statute in favor of consumers. *See Miller v. Colortyme, Inc.*, 518 N.W.2d 544, 548 (Minn. 1994) (noting that remedial statutes, such as consumer protection statutes, should be construed liberally to promote their objectives). But we need not consider any construction other than the one the plain language embodies unless the statute is ambiguous, and we see no ambiguity in

16

the relevant language. The rule of liberal construction does not apply because the statute is unambiguous on its face. *See Larson v. State*, 790 N.W.2d 700, 704 (Minn. 2010). We "cannot rewrite a statute under the guise of statutory interpretation." *Laase v. 2007 Chevrolet Tahoe*, 776 N.W.2d 431, 438 (Minn. 2009).

The state argues next that section 56.01(a) must be read *in pari materia* with section 56.15, subdivision 1. But the *in pari merteria* doctrine is a tool for interpreting ambiguous statutory language, *State v. Lucas*, 589 N.W.2d 91, 94 (Minn. 1999), and we conclude that section 56.01(a) is unambiguous. And the state's argument is further off target because the doctrine applies to statutory language "relating to the same person or thing or having a common purpose." *Apple Valley Red-E-Mix, Inc. v. State by Dep't of Pub. Safety*, 352 N.W.2d 402, 404 (Minn. 1984). This is not the situation here. Section 56.15, subdivision 1 provides:

> No *licensee* shall directly or indirectly, charge, contract for, or receive any interest, discount, charges, or consideration *greater than the lender would be permitted by law to charge if the lender were not a licensee hereunder* upon the loan, use or forbearance of money, goods, or things in action, or upon the loan, use or sale of credit, *of the amount or value of more than that regulated by this chapter*.

(emphasis added). Although section 56.01(a) has some language similar to this provision, the two sections cannot be read *in pari materia* because they refer to different persons. Section 56.01(a) identifies who must obtain a license, and section 56.15, subdivision 1, refers to the interest-rate limitation placed on licensees. Section 56.15 clarifies that a licensee may not charge the 27.15% interest rate afforded by chapter 56 on amounts exceeding $100,000. For loans over that amount, lenders are limited to interest rates they

17

"would be permitted by law to charge if the lender were not a licensee [under chapter 56]." Minn. Stat. § 56.15, subd. 1.

The state maintains finally that the schools' construction would produce an absurd result. *See* Minn. Stat. § 645.17(1) (2014) (stating the presumption that the legislature does not intend an absurd result). The state does not develop the argument beyond the assertion that "the Commissioner of Commerce does not and cannot license usurious lending." The argument overlooks the fact that the 8% interest-rate limit in section 334.01 is merely a default ceiling subject to statutory exceptions. *Rathbun*, 300 Minn. at 231, 219 N.W.2d at 647. If an exception allows an interest rate above the general 8% limit, the rate is not usurious. *See id.* at n.3 (listing interest rates under chapter 56 as one exception to the usury statute). We see no absurdity in this result.

We have seen that section 56.01(a)'s plain language requires certain non-financial-institution lenders who are engaged in the business of making loans under $100,000 to obtain a license in order to charge interest rates up to 21.75%. Lenders who do not obtain a license are not foreclosed by chapter 56 from making loans, as long as the interest rates they charge are less than the rates otherwise permitted by law (meaning, below the general 8% limit in section 334.01 or a rate allowed by an exception to that limit). Because we hold that the schools' loans are open-end credit plans under Minnesota Statutes section 334.16, the schools are not prohibited from charging up to 18% interest and are not engaged in unlicensed lending under Minnesota Statutes section 56.01(a).

## D E C I S I O N

The schools' institutional loans are open-end credit plans under Minnesota Statutes section 334.16. Because the loans do not exceed the 18% maximum interest rate under that provision, they are not usurious. And because the schools are permitted by law to charge that rate, Minnesota Statues section 56.01(a) does not require them to obtain a license.

**Affirmed.**