**STATE of Minnesota, Appellant,**

**v.,**

**MINNESOTA SCHOOL OF BUSINESS, INC. d/b/a Minnesota School of Business, et al., Respondents.**

**A16-0239**

Supreme Court of Minnesota.

Filed: July 26, 2017

Court of Appeals

Lori Swanson, Attorney General, Alan I. Gilbert, Solicitor General, Kathryn I. Landrum, Adam Welle, Assistant Attorneys General, Saint Paul, Minnesota, for appellant.

Joseph W. Anthony, Brooke D. Anthony, Daniel R. Hall, Amelia Selvig Hartman, Anthony Ostlund Baer & Louwagie, P.A., Minneapolis, Minnesota, for respondents.

## OPINION

LILLEHAUG, Justice.

Respondents, Minnesota School of Business and Globe University (collectively, "the Schools"), made private student loans at interest rates of up to 18 percent. The State, through the Minnesota Attorney General, sought to enjoin the Schools from making these loans. Among other things, the State alleged that the Schools charged usurious interest rates and made loans without the required license. On cross-motions for summary judgment, the district court denied the State's motion in its entirety and dismissed the usury and licensing claims. On interlocutory appeal, the court of appeals affirmed the district court. Because we conclude that the Schools charged usurious interest rates and made loans without the required license, we re-verse the court of appeals and remand to the district court for further proceedings consistent with this opinion.

## FACTS

The Schools are for-profit corporations providing postsecondary education services and private student loans in Minnesota. The Schools offered the loans to students for a maximum of $3,000 to $7,500 per loan, usually at interest rates between 12 and 18 percent, depending on the timing and type of loan.[1] A student receiving a loan from the Schools entered into an agreement at the beginning of each academic year. The Schools never paid out money to the student; rather, the Schools' affiliated entities—EdOp Loan Servicing, LLC and Tuition Options, LLC—credited the loaned amount against the student's outstanding tuition balance at three predetermined dates during the academic year. The funds were not available to the student for any other purpose.

Interest on each loan began accruing immediately after the loan was credited against the outstanding tuition balance. The student repaid the loan according to a monthly schedule with a fixed end date by which the entirety of the loan and accrued interest had to be paid off. If the student paid off the debt early, no additional funds were available. The Schools required the student to sign a form that included an acknowledgment that the loan was not an "extension of credit under an open-end consumer credit plan." An internal procedures manual for the Schools' EdOp Loan Servicing, LLC described the loan as "a 'hybrid' that blends characteristics of an open-ended credit plan and closed-end installment loan."

---

1. The Schools offered two types of loans: Educational Opportunities (EdOp) and Student Access (StA) loans. Under the EdOp program, students could obtain up to $7,500 per loan.

Under the StA program, students could obtain up to $7,500 per loan until 2014, at which point the Schools capped the StA program at $3,000 per loan.

The State, through the Attorney General, initially sued the Schools on grounds that are not now before us.[2] The State later filed an amended complaint that added claims against the Schools for lending without the license required by Minn. Stat. § 56.01(a) (2016) (Count 3), and charging usurious interest rates in violation of Minn. Stat. § 334.01, subd. 1 (2016) (Count 4). The State's amended complaint sought permanent statutory injunctive relief under Minn. Stat. § 8.31, subd. 3 (2016), to stop the Schools from "engaging in unlicensed and usurious lending, in violation of Minn. Stat. §§ 56.01 and 334.01."

The parties filed cross-motions for summary judgment. The State's summary judgment motion asked the district court to "enjoin Defendants' illegal lending." The State's proposed order granting summary judgment included permanent statutory injunctions against usurious and unlicensed lending. The Schools responded that their lending was not usurious under Minn. Stat. § 334.16, subd. 1 (2016), and that they were not required to obtain a license under Minn. Stat. § 56.01(a).

The district court agreed with the Schools. The court "denie[d] the State's Motion for Summary Judgment in its entirety." The court granted the Schools' motion for summary judgment regarding the State's usury and licensing claims, which the court dismissed.[3]

The State took an interlocutory appeal. The Schools argued that the court of appeals lacked appellate jurisdiction over an order denying summary judgment. The court of appeals determined there was jurisdiction because the district court denied a request for an injunction. *State v. Minn. Sch. of Bus., Inc.*, A16-0239, Order (Minn. App. filed Mar. 15, 2016).

On the merits, the court of appeals affirmed the district court. *State v. Minn. Sch. of Bus., Inc.*, 885 N.W.2d 512, 514 (Minn. App. 2016). In reaching this conclusion, the court determined that Minn. Stat. § 334.16, subd. 2 (2016), which adopts the Truth-in-Lending Act ("TILA") and Regulation Z, did not incorporate any amendments to TILA or Regulation Z adopted after June 5, 1971, the effective date of the enactment of Minn. Stat. § 334.16, subd. 2. *Minn. Sch. of Bus., Inc.*, 885 N.W.2d at 516-18. The court concluded that, under the definitions provided by TILA and Regulation Z as of that date, the Schools' loans were open-end credit plans under Minn. Stat. § 334.16, subd. 1(a).

We granted the State's petition for review.

## ANALYSIS

We begin by addressing the parties' disagreement over the standard of review. The State argues that we should review the district court's order as a summary judgment decision. The Schools argue that we should consider the order as a denial of injunctive relief.

---

**2.** Specifically, the State sued the Schools for defrauding consumers in violation of Minn. Stat. § 325F.69 (2016) (Count 1), and engaging in deceptive trade practices in violation of Minn. Stat. § 325D.44 (2016) (Count 2).

**3.** The district court concluded that genuine issues of material fact precluded summary judgment on Counts 1 and 2. A bench trial was held on those counts on April 4-26, 2016. *See State v. Minn. Sch. of Bus., Inc.*, No. 27-

CV-14-12558, Findings of Fact, Conclusions of Law, and Order, at 1-2 (Henn. Cty. Dist. Ct. filed Sept. 8, 2016). The district court held for the State on Counts 1 and 2. *Id.* at 131. The final judgment included permanent statutory injunctive relief, civil penalties, costs, disbursements, attorney's fees, and restitution. *See id.* at 131-33; *State v. Minn. Sch. of Bus., Inc.*, No. 27-CV-14-12558, Order for Restitution (Henn. Cty. Dist. Ct. filed Jan. 4, 2017).

■ We need not resolve the disagreement because, under either theory, we apply a de novo standard of review. The facts are undisputed and the issues before us are purely legal. We apply a de novo standard of review to statutory interpretation and the application of a statute to undisputed facts, whether in the context of summary judgment or an injunction. *Anderson v. Christopherson*, 816 N.W.2d 626, 630 (Minn. 2012) (applying a de novo standard of review to issues of law presented in an appeal from a summary judgment decision); *Fannie Mae v. Heather Apartments Ltd. P'ship*, 811 N.W.2d 596, 599 (Minn. 2012) (applying a de novo standard of review to issues of law presented in an appeal from an order for injunctive relief).

I.

■ We now address whether the court of appeals had appellate jurisdiction over the State's interlocutory appeal.[4] The Attorney General is "entitled" to a statutory injunction for "violations of the law of this state respecting unfair, discriminatory, and other unlawful practices in business, commerce, or trade." Minn. Stat. § 8.31, subds. 1, 3 (2016). Under Minn. R. Civ. App. P. 103.03, "[a]n appeal may be taken to the Court of Appeals: ... (b) from an order which grants, refuses, dissolves or refuses to dissolve, an injunction."

The Schools argue that the district court's order did not deny an injunction because the State did not seek an injunction in its motion for summary judgment. Specifically, the Schools argue that the State did not allege irreparable harm, did not argue the *Dahlberg* factors, and did not file a separate motion for an injunction. *See Dahlberg Bros., Inc. v. Ford Motor Co.*, 272 Minn. 264, 137 N.W.2d 314, 321-22 (1965) (stating the factors to consider for a temporary injunction). The Schools suggest, however, that appellate jurisdiction is proper under Minn. R. Civ. App. P. 105.01, which allows appeals "in the interests of justice."

The State argues that it sought and was denied a permanent statutory injunction. The State notes that the Attorney General is authorized to seek such an injunction under Minn. Stat. § 8.31, subd. 3, which does not require a showing of irreparable harm. The State also contends that the *Dahlberg* factors do not apply to permanent injunctions. Finally, the State joins the Schools in suggesting that appellate jurisdiction is proper under Rule 105.01.

We conclude that it is unnecessary to rely on Rule 105.01. The court of appeals had appellate jurisdiction over the interlocutory appeal because the district court refused a permanent injunction sought by the Attorney General under Minn. Stat. § 8.31, subd. 3. Denial of that relief meant that an interlocutory appeal was available under Rule 103.03(b).

■ The Schools' argument that there was no showing of irreparable harm or analysis of the *Dahlberg* factors is unavailing in the context of a permanent injunction sought under Minn. Stat. § 8.31, subd. 3. The conditions that must be met to

---

4. The parties did not seek review of the court of appeals' decision to exercise appellate jurisdiction over the State's interlocutory appeal under Minn. R. Civ. App. P. 103.03(b). *See State v. Minn. Sch. of Bus., Inc.*, A16-0239, Order at 2 (Minn. App. filed Mar. 15, 2016). However, in our order granting the State's petition for review, we directed the parties to address "the decision of the court of appeals to accept jurisdiction over this appeal." *State v. Minn. Sch. of Bus., Inc.*, A16-0239, Order (Minn. filed Nov. 23, 2016). *See McCullough & Sons, Inc. v. City of Vadnais Heights*, 883 N.W.2d 580, 585 (Minn. 2016) (explaining that we can question jurisdiction at any time, including "whether the court of appeals had jurisdiction to decide the appeal").

grant a statutory injunction are determined by the text of the statute authorizing the injunction.[5] Here, Minn. Stat. § 8.31, subd. 3, provides, "the attorney general *shall be entitled* ... to sue for and have injunctive relief" upon "becoming satisfied that any of [the laws in Minn. Stat. § 8.31, subd. 1] *has been or is being violated, or is about to be violated.*" (Emphasis added). Accordingly, a permanent injunction sought under Minn. Stat. § 8.31, subd. 3, does not, by the terms of the statute, require a showing of irreparable harm, inadequacy of other remedies, consideration of equitable principles, or analysis of the *Dahlberg* factors. The Legislature has provided a statutory remedy that is distinct from an equitable injunction, meaning the Attorney General's burden to obtain a permanent injunction under the statute is limited to the statutory condition: proving that a listed law "has been or is being violated, or is about to be violated." The district court refused to grant a permanent injunction sought by the Attorney General under Minn. Stat. § 8.31, subd. 3, and thus that decision was appealable on an interlocutory basis under Rule 103.03(b).

The Schools' other argument—that the State's request for an injunction was invalid absent a separate motion—is also unavailing. Our precedent is directly on point. In *Hursh v. Vill. of Long Lake*, 247 Minn. 1, 75 N.W.2d 602, 604 (1956), we treated a district court order that granted a defendant's summary judgment motion and dismissed claims seeking injunctive relief "as an order refusing an injunction," even though there was no separate motion for an injunction. Here, as part of its motion for summary judgment, including in its proposed order, the State sought permanent statutory injunctive relief. The district court "denie[d] the State's Motion for Summary Judgment in its entirety." In other words, the district court refused the State's request for a permanent statutory injunction. *See* Minn. R. Civ. App. P. 103.03(b). Accordingly, the court of appeals correctly held that it had appellate jurisdiction under Minn. R. Civ. App. P. 103.03(b).

## II.

■ We next consider whether the Schools charged usurious interest rates in violation of Minnesota's general usury statute. *See* Minn. Stat. § 334.01, subd. 1. The statute caps interest rates at 8 percent for written contracts. *Id.* But a lender may charge up to 18 percent interest for a "consumer credit sale pursuant to an open end credit plan." Minn. Stat. § 334.16, subd. 1(a)-(b).

The parties agree that the Schools' loans were consumer credit sales. Whether the loans were made "pursuant to an open end credit plan" is the central issue in this case. If they were, the Schools were allowed to charge up to 18 percent interest. If they were not, the Schools violated the usury statute.

Minnesota Statutes § 334.16, subdivision 1(a), describes "a consumer credit sale pursuant to an open end credit plan,

5. *Cf. Sec. & Exch. Comm'n v. Torr*, 87 F.2d 446, 450 (2d Cir. 1937) ("As the issuance of an injunction in cases of this nature has statutory sanction, it is of no moment that the plaintiff has failed to show threatened irreparable injury or the like, for it would be enough if the statutory conditions for injunctive relief were made to appear."); *United States v. Beatty*, 88 F.Supp. 646, 652 (S.D. Iowa 1950) ("The conditions upon which statutory injunctions shall issue are solely those provided by the statute in question."); *Oregon ex rel. Heltzel v. O.K. Transfer Co.*, 215 Or. 8, 330 P.2d 510, 513 (1958) (holding that a permanent statutory injunction must be issued "if the statutory conditions are made to appear").

agreement or arrangement" as having at least the following characteristics:

> (1) the seller may permit the buyer to make purchases from time to time from the seller or other sellers, (2) the buyer has the privilege of paying the balance in full or in installments, and (3) a finance charge may be computed by the seller from time to time on an outstanding unpaid balance.

The parties rely on this language, but also rely on the definitions provided by TILA and Regulation Z because the Minnesota Legislature provided as follows:

> The definitions ... in the Truth-in-Lending Act, Title I of the Consumer Credit Protection Act, P.L.90-321, and in Regulation Z of the Board of Governors of the Federal Reserve System adopted pursuant thereto, 12 CFR 226, as in effect on the effective date of this act, shall apply to the terms used in this act and computations hereunder.

Act of June 4, 1971, ch. 877, § 1, 1971 Minn. Laws 1769, 1770. The Office of the Revisor of Statutes translated "the effective date of this act" to mean "as in effect on June 5, 1971," the effective date of the act. *See* Minn. Stat. § 334.16, subd. 2; *see also* Minn. Stat. § 3C.10, subd. 1 (2016) ("The Revisor's Office, in preparing printer's copy for editions of statutes, may ... (h) substitute the date on which the law becomes effective for the words 'the effective date of this act,' and the like....").

The Schools and the State disagree on whether Minn. Stat. § 334.16, subd. 2, by its terms, incorporates subsequent amendments to TILA and Regulation Z. They agree that if the current versions of TILA and Regulation Z are incorporated, the Schools' loans are not made pursuant to open-end credit plans and the loans are usurious. But we need not reach the issue, as we conclude that the case may be re-solved by interpreting and applying the 1971 versions of TILA and Regulation Z.

The version of TILA in effect on June 5, 1971, defined "open end credit plan" as "a plan prescribing the terms of credit transactions which may be made thereunder from time to time and under the terms of which a finance charge may be computed on the outstanding unpaid balance from time to time thereunder." 15 U.S.C. § 1602(i) (1970). The version of Regulation Z in effect on that date defined "Open end credit" as:

> consumer credit extended on an account pursuant to a plan under which (1) the creditor may permit the customer to make purchases or obtain loans, from time to time, directly from the creditor or indirectly by use of a credit card, check, or other device, as the plan may provide; (2) the customer has the privilege of paying the balance in full or in installments; and (3) a finance charge may be computed by the creditor from time to time on an outstanding unpaid balance.

12 C.F.R. § 226.2(r) (1971).

The parties dispute whether the Schools' loans allow students "to make purchases ... from time to time." The dispute centers on whether the 1971 definition means that open-end credit plans are those that provide revolving credit. *See The American Heritage Dictionary of the English Language* 1504 (5th ed. 2011) (defining "revolving credit" as "[c]redit repeatedly available up to a specified amount as periodic payments are made"); *Webster's Third New International Dictionary* 1945 (1961) (defining "revolving credit" as "credit which may be used repeatedly up to the limit specified after partial or total repayments have been made").

We conclude that the 1971 federal definition of open-end credit plan included revolving credit. The requirement was pres-

ent in the plain language of the federal law. Specifically, Regulation Z, in a section titled "Open end credit distinguished from other credit," stated, "[u]nder an open end credit account plan, it is contemplated that there will or may be repetitive transactions on a revolving basis." 12 C.F.R. § 226.203(a) (1971). Revolving credit is not available under the loan arrangement offered by the Schools.

The Schools argue that the 1971 Regulation Z language does not make revolving credit an essential characteristic of an open-end credit plan, but only a permissible characteristic. We disagree. An open-end credit plan "refers to a plan prescribing the terms of credit transactions which *may* be made thereunder from time to time." 15 U.S.C. § 1602(i) (1970) (emphasis added). A lender offering an open-end credit plan to a buyer provides credit on a revolving basis, which the buyer may or may not use.

Both federal and state case law have recognized revolving credit as an essential characteristic of open-end credit plans under the 1971 definition. For example, *Goldman v. First Nat'l Bank of Chicago*, 532 F.2d 10, 18-19 (7th Cir. 1976), discussed the "distinctive qualities of open end credit plans," including the fact that "as payments are made, the lines are cleared and the gross total of the transactions may well exceed the ceiling amount so long as pay-

ments keep the net balance at any one time below the credit limit." [6] *See also Maes v. Motivation for Tomorrow, Inc.*, 356 F.Supp. 47, 50 (N.D. Cal. 1973) (rejecting a creditor's argument that a contract was "open end credit" because the contract, unlike "credit card or charge accounts," did not contemplate "repetitive transactions on a revolving basis" (citation omitted) (internal quotation marks omitted)). Our own case law is consistent with that interpretation. *See Wise Furniture v. Dehning*, 343 N.W.2d 26, 29 (Minn. 1984) ("The carrying forward of the balance due on each previous contract resembles a revolving charge." (citing *Goldman*, 532 F.2d 10; *Maes*, 356 F.Supp. 47)); *Rathbun v. W.T. Grant Co.*, 300 Minn. 223, 219 N.W.2d 641, 647 n.3 (1974) (discussing exceptions to the general 8 percent interest cap, including "revolving charge accounts" under Minn. Stat. § 334.16).

A comparison of the disclosures required for closed- and open-end credit further confirms the difference between the two types of credit. *Compare* 12 C.F.R. § 226.8(b)(3) (1971) (discussing disclosures required for "Credit other than open end," including calculations of "The number, amount, and due dates or periods of payments scheduled to repay the indebtedness" and "the sum of such payments using the term, 'total of payments' "), *with* 12 C.F.R. § 226.7(a) (1971) (discussing re-

---

6. The Schools attempt to distinguish the discussion of revolving credit in *Goldman* as dicta. We disagree. The revolving-credit discussion in *Goldman* is central to the decision, and is particularly informative here. In *Goldman*, the borrower's open-end credit plan, set forth in the lender's TILA disclosure, included a 25-day "free ride" period to pay off any monthly outstanding balance. 532 F.2d at 13. When the borrower did not pay off the balance, the lender imposed a finance charge that included interest accrued during the "free ride" period. *Id.* The borrower sued, alleging this violated the TILA disclosure. *Id.*

The district court concluded the statute of limitations had expired because the lender provided the disclosure more than a year earlier. *Id.* at 16.

On appeal, the Seventh Circuit specifically noted how open-end credit plans "differ[] from the close end plans," including by paying down the outstanding balance on which a finance charge can be imposed. *Id.* at 18. The court described this revolving-credit characteristic as a "distinctive qualit[y] of open end credit plans" and explained how it was directly responsible for the statute-of-limitations issue before the court. *Id.* at 19.

quired disclosures for open end credit but omitting any discussion of a payment schedule or the idea that a "total of payments" can be calculated at the outset). Here, the Schools' loan documents provided a "Repayment Schedule," including a fixed end date by which the entirety of the loan and accrued interest must be repaid. These terms are consistent with a closed-end loan. Moreover, these terms simply do not make sense in the context of an open-end credit plan because it would be *open ended*, i.e., there would be no fixed end date.

The Schools, though, argue that revolving credit was only added as an essential characteristic of open-end credit plans in 1982 when the Federal Reserve Board amended Regulation Z's definition of open end credit. That amendment required that the "amount of credit that may be extended to the consumer during the term of the plan (up to any limit set by the creditor) is generally made available to the extent that any outstanding balance is repaid." 12 C.F.R. § 226.2(a)(20) (1983). The State argues that this amendment merely clarified the definition in effect in 1971.

We agree with the State. Revolving credit was part of the 1971 definition. *See* 12 C.F.R. § 223.203(a) (1971); *see also Wise Furniture*, 343 N.W.2d at 29 ("The carrying forward of the balance due on each previous contract resembles a revolving charge." (citing *Goldman*, 532 F.2d 10; *Maes*, 356 F.Supp. 47)); [7] *Rathbun*, 219 N.W.2d at 647 n.3. Revolving credit has always been an essential feature of open-end credit plans. The 1982 amendment made that even clearer.

Indeed, the Schools' own loan documentation establishes that they did not offer open-end credit plans. The Schools required students to sign a form that included an acknowledgment that the loan was *not* an "extension of credit under an open-end consumer credit plan." And their own loan servicing entity recognized that each loan was "a 'hybrid' that blends characteristics of an open-ended credit plan and closed-end installment loan." In essence, the Schools structured their loans to give themselves the benefit of open-end credit plans—charging interest in excess of 8 percent—without providing their students the benefit of revolving credit.

Accordingly, the loans were not made pursuant to open-end credit plans under Minn. Stat. § 334.16, subd. 1(a). It follows that the Schools charged usurious interest rates in violation of Minn. Stat. § 334.01, subd. 1.

### III.

 Finally, we consider whether the Schools were required to obtain a Chapter 56 lending license under Minn. Stat. § 56.01(a). That statute states:

> Except as authorized by this chapter and without first obtaining a license from the commissioner, no person shall engage in the business of making loans

---

**7.** The Schools attempt to · distinguish *Wise Furniture* based on the structure of the transactions in that case. Specifically, the plaintiff made four separate purchases over several months, each of which "refinanced the previous contract," incorporating the previous debts and security interests into the new contract. 343 N.W.2d at 28. We considered whether the transactions constituted an "open end credit plan" under the 1982 definition, noting that the transactions "have open end characteristics." *Id.* at 28-29 (citing 15 U.S.C. § 1602(i) (1982)). In the very next sentence, we specified what those open end characteristics were: "The carrying forward of the balance due on each previous contract resembles a revolving charge." *Id.* at 29 (citing *Goldman*, 532 F.2d 10; *Maes*, 356 F.Supp. 47). In other words, we recognized that the revolving-credit characteristic predated the 1982 amendment.

of money, credit, goods, or things in action, in an amount or of a value not exceeding that specified in section 56.131, subdivision 1, and charge, contract for, or receive on the loan a greater rate of interest, discount, or consideration than the lender would be permitted by law to charge if not a licensee under this chapter.

Minn. Stat. § 56.01(a).

The parties offer different interpretations of when the statute requires a person to obtain a Chapter 56 license. Under the State's interpretation, the Schools needed a license because they "engage[d] in the business of making loans." Under the Schools' interpretation, they needed a Chapter 56 license only if they both "engage[d] in the business of making loans," and charged an interest rate greater than 8 percent that was not otherwise authorized for non-licensees. The Schools do not contest that they were in the business of making loans, but contend that Minn. Stat. § 334.16, subd. 1 authorized them to charge an interest rate greater than 8 percent. Therefore, the Schools argue, they did not need a Chapter 56 license.

We need not decide which of the parties' interpretations is correct, because under either interpretation the Schools were required to obtain a Chapter 56 license. At oral argument, the Schools conceded that, under their interpretation, they would be required to obtain a Chapter 56 license if their loans were not made pursuant to open-end credit plans under Minn. Stat. § 334.16, subd. 1(a). Because we hold that the Schools' loans were not so made, Minn. Stat. § 334.16 did not authorize the Schools to charge an interest rate above 8 percent. Instead, the Schools were required to obtain a Chapter 56 license. Their failure to do so means they engaged in unlicensed lending in violation of Minn. Stat. § 56.01(a).

## CONCLUSION

For the foregoing reasons, we reverse the decision of the court of appeals and remand to the district court for further proceedings consistent with this opinion.

Reversed and remanded.

STRAS, J., took no part in the consideration or decision of this case.